

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-4-2002

# USA v. Perez

Precedential or Non-Precedential:

Docket 0-5237

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Perez" (2002). *2002 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 4, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 00-5237, 00-5238, 00-5261

UNITED STATES OF AMERICA

v.

LINETTE PEREZ, Appellant in No. 00-5237

UNITED STATES OF AMERICA

v.

JUANCHO ALCANTERA, Appellant in No. 00-5238

UNITED STATES OF AMERICA

v.

EDMUNDO BATOON, Appellant in No. 00-5261

Consolidated Appeals From the
United States District Court
For the District of New Jersey
(D.C. Crim. No. 99-cr-00100-3, No. 99-cr-00100-4 and
No. 99-00100-6)
District Judge: Honorable John W. Bissell

Argued: December 12, 2000

Before: SCIRICA, AMBRO, Circuit Judges, and
POLLAK, District Judge*
_____

* The Honorable Louis H. Pollak, Senior District Judge for the Eastern
District of Pennsylvania, sitting by designation.

(Filed: February 4, 2002)

      James A. Galdieri (Argued)
      Miller & Galdieri
      32 Jones Street
      Jersey City, NJ 07306

      Attorney for Appellant
      Linette Perez

      Paul X. Escandon
      414 Corlies Avenue
      Allenhurst, NJ 07711
      Stephen M. Latimer (Argued)
      131 Main Street
      Suite 235
      Hackensack, NJ 07601

      Attorneys for Appellant
      Juancho Alcantera

      Robert Kasenow, II (Argued)
      401 Broadway, Suite 1401
      New York, NY 10013

      Attorney for Appellant
      Edmundo Batoon

      Robert J. Cleary
      United States Attorney
      George S. Leone
      Chief, Appeals Division
      970 Broad Street
      Newark, NJ 07102-2535

      Norman J. Gross (Argued)
      Assistant United States Attorney
      United States Attorney's Office
      Camden Federal Building and
       United States Courthouse
      P.O. Box 2098
      Camden, NJ 08101-2098

      Attorneys for Appellee
      United States of America

OPINION OF THE COURT

AMBRO, Circuit Judge

Defendants/Appellants Linette Perez ("Perez"), Juancho
Alcantera ("Alcantera"), and Edmundo Batoon ("Batoon")
appeal their convictions on the charge of conspiracy to
distribute and possess with the intent to distribute
methamphetamine, a Schedule II controlled substance, in
the District of New Jersey and elsewhere in violation of 21
U.S.C. S 846 and S 841(a)(1). All three were convicted by a
jury in the United States District Court for the District of
New Jersey. In this appeal, Appellants challenge their
convictions on numerous grounds, one of which is a
question of first impression for this Court -- whether and
under what circumstances the trial court must give a jury
instruction on venue. Appellants Alcantera and Batoon also
challenge the District Court's ruling on a minor role
reduction, and the attributable drug quantity, at
sentencing. We affirm the convictions and sentences of
each Appellant.

I. Factual and Procedural Background

A. Factual Background

In the following recitation of the facts on which
Appellants' convictions were based, we construe those facts
in the light most favorable to the Government, as we must
following the jury's guilty verdict. Glasser v. United States,
315 U.S. 60, 80 (1942). Beginning in 1998, agents of the
Federal Bureau of Investigation and the Drug Enforcement
Agency based in New Jersey opened an investigation into
drug operations allegedly headed up by Lirio Del Rosario
("Del Rosario") based on information supplied by a
confidential source. With Del Rosario at the helm, the
organization imported and distributed crystal
methamphetamine in New York and New Jersey.

The factual scenario leading up to and encompassing the
arrest of Appellants unfolds as follows. In January of 1999,
Del Rosario's supply of methamphetamine ran low. He

dispatched Alcantera and another man to the home of Augustin Daluro ("Daluro") in Jersey City, New Jersey to procure more of the drug. Daluro gave twenty grams of methamphetamine to Alcantera, without charge, for delivery to Del Rosario. At that time, Del Rosario told Daluro that he was getting travel documents for a woman named "Linette" so that she could smuggle methamphetamine into the United States as part of his operation.

In early February of 1999, members of the Queens Narcotics Division of the New York City Police Department ("N.Y.P.D.") received information of Del Rosario's drug operation from another confidential informant (CI-1), and began an independent investigation. When the federal and local investigators learned that they were conducting parallel investigations, they agreed to pool their information. The confidential informants tipped off the federal and N.Y.P.D. investigators that a woman named "Linette" would be bringing in a large shipment of methamphetamine through John F. Kennedy Airport on February 24, 1999. The informant offered a description of "Linette," which was later confirmed by several customs agents.

On February 18, 1999, Perez, who at the time was a United States citizen living in Virginia, obtained a passport. The following day, she purchased a round-trip ticket from J.F.K. Airport to Manila, the Philippines, through a New York City travel agency. Perez departed from the United States on February 22, 1999, and checked into the Manila Holiday Inn where she stayed for two days. While in Manila, Perez obtained ten kilograms of crystal methamphetamine from relatives of Del Rosario. The methamphetamine was put into plastic baggies, hidden inside fabric shoulder pads of women's dresses, and placed into two large cardboard boxes.

On February 23, 1999, while Perez was still in Manila, Del Rosario called Prajedo Almiranez ("Almiranez") and asked him to pick up Perez when she arrived at J.F.K. Airport, but he was unable to go. On February 24, 1999, Del Rosario called Nestor Uy ("Uy"), a Filipino living in New York City who occasionally repaired automobiles for Del Rosario, and asked him to pick up Perez. Uy had met Perez

4

before at Del Rosario's home. Del Rosario told Uy that Perez would be arriving at J.F.K. Airport on Asianna Airlines, and gave Uy money to pay the excess baggage fee for the packages Perez was bringing in from the Philippines, for a hotel room for Perez at the Queens Motor Inn, and for gas and food.

Perez returned to the United States that evening with the two large boxes, arriving at J.F.K. Airport at approximately 8:35 p.m. Uy arrived late to J.F.K. Airport, and was unable to find Perez. He called the number for Alcantera's cell phone several times and spoke to Del Rosario, who told him to keep looking for Perez. At the same time, several N.Y.P.D. investigators also went to J.F.K. Airport with CI-1 to intercept Perez, but they were unable to locate her.

Finally, Uy discovered that Perez had taken a cab to Del Rosario's home. Uy went to the Queens Motor Inn and reserved a room for Perez under his name, then went to Del Rosario's apartment to pick up Perez. In Del Rosario's living room were the two large boxes. Uy then drove Perez back to the hotel. During the trip, Perez told Uy that she had just smuggled ten kilos of methamphetamine into the United States from Del Rosario's family in the Philippines, boasting that she "had the guts to do that." Uy stayed with Perez at the hotel briefly, then drove her to Batoon's home in Elmhurst, Queens.

At around 10:00 a.m. the next morning, February 25th, Almiranez picked up Perez from Batoon's home and drove her to Del Rosario's apartment. Uy arrived at the apartment at approximately 11:00 a.m. He saw that the boxes had been opened, the plastic bags removed from the shoulder pads of the dresses and cut open, and the methamphetamine taken out. Del Rosario explained to Uy how the methamphetamine had been packaged and how Asianna Airlines and the customs officials protected Del Rosario's drug shipments.

Del Rosario then called Arturo Zoletta, who had previously delivered methamphetamine for him. Del Rosario told Zoletta that he had a shipment of methamphetamine for him to deliver to another person. Zoletta paged Roland Abaia, a cab driver, to pick him up at his home. The two

5

drove to Del Rosario's apartment in Abaia's Lincoln Towncar.

At approximately 2:00 that afternoon, acting on a tip from CI-1 that Del Rosario was dealing methamphetamine out of three possible locations, plain-clothed investigators and uniformed officers from the N.Y.P.D. staked out Del Rosario's apartment building, an automobile body shop, and Uy's residence, all in Queens.

Del Rosario's apartment building was four stories high, with four apartment units on each floor. The N.Y.P.D. officers knew from the informant that Del Rosario's apartment was 2C. It was located at the back of the second floor, and one could not see the street from the inside. Nor could the surveilling officers tell which apartment was Del Rosario's from the outside of the building. They observed several cars stop outside of Del Rosario's apartment building, stay for a few minutes, then leave. Just before 6:00 p.m., the investigators observed Abaia drive up to Del Rosario's apartment building in the Lincoln Towncar with Zoletta in the back seat. Zoletta got out of the car and entered the building empty-handed while Abaia waited outside.

Zoletta emerged from the apartment building approximately ten minutes later, carrying a clear plastic bag with a white plastic bag inside of it. He got back into the Lincoln Towncar, and showed the bag to Abaia. The two drove off, followed by two of the plain-clothed police investigators driving an unmarked police car. Zoletta turned around and made eye contact with one of the investigators. The investigators observed Zoletta lean over, apparently to stuff the bag under the front seat. After Zoletta and Abaia had driven two blocks and turned the corner, the investigators pulled them over.

The investigators saw the clear bag with a white shopping bag inside. In the white bag, the investigators found what appeared to be approximately 200 grams of methamphetamine, and they placed Abaia and Zoletta under arrest. A search of the car uncovered more drugs and drug paraphernalia, including a small gram-weight scale, pipes used for smoking methamphetamine, ziplock

6

bags, a cell phone, and a pager. At this point, Zoletta cooperated with the investigators, telling them that he had worked for Del Rosario delivering methamphetamine for two years in New York City and New Jersey. Zoletta told the investigators that he had just been in Del Rosario's apartment, Unit 2C, and that Del Rosario had just given him a package of drugs to deliver. Zoletta told the investigators that there were several people still in the apartment.

The interchange lasted only a few minutes, after which the officers decided to get a search warrant. However, apparently fearing that their arrest of Zoletta would tip off the occupants in the apartment to destroy the drugs, the officers decided to forego getting the warrant. Instead, the investigators returned to the apartment building and with the uniformed officers went up to Del Rosario's apartment. They knocked, and when a woman answered, the uniformed officers stated that they had received a disturbance call and asked if they could come in to see if everyone was all right. The woman, Perez, let them into the apartment.

Upon entering, the officers encountered Del Rosario, Perez, Alcantera, Batoon, and Almiranez inside. A bag of approximately 100 grams of crystal methamphetamine was in plain view on top of the television in the living room. The officers placed all of the occupants of the apartment under arrest and conducted a protective sweep to secure the premises and to assure their safety. Perez told the officers that she had just returned from the Philippines and was staying at the Queens Motor Inn. She gave her consent to search the hotel room and handed the officers the key. At this point, two of the officers left with Zoletta to obtain search warrants for Del Rosario's apartment and Perez's hotel room.

The officers completed the warrant affidavit with the assistance of the Queens County District Attorney's office. They included in the warrant reference to what was seen at the apartment. However, due to the unavailability of judges at the late hour, the officers had to travel to Manhattan to obtain judicial review of the warrant application.

7

Meanwhile, back at the apartment, Daluro arrived with a suitcase containing $67,500. The officers present placed him under arrest and seized the suitcase.

At approximately 4:00 the next morning (February 26), the officers who went for the search warrant returned to Del Rosario's apartment with the warrant and began to conduct a search. In the course of the search, they discovered approximately four kilograms of crystal methamphetamine, over $28,000 in cash belonging to Del Rosario, hand-written records of drug transactions, numerous plastic ziplock bags in five different sizes, several BB rifles and pistols, three cell phones, a pager, a combination cell phone and two-way radio, and a bulletproof vest.

From Perez the officers seized $724, her passport, a Virginia driver's license, and two credit cards. From her hotel room, they seized the written itinerary for her recent trip to Manila and credit card receipts from her stay there. From Almiranez the officers took into custody three plastic bags and a cigarette box containing 116 grams of crystal methamphetamine. They captured from Alcantera a cell phone with a battery and a pager. From Batoon they took hold of a small amount of methamphetamine consistent with personal use and a pager.

B. Procedural Background

On March 1, 1999, a federal grand jury issued a one-count indictment charging Appellants and five co-defendants1 with violating 21 U.S.C. S 846 by conspiring to distribute and to possess with intent to distribute more than one kilogram of methamphetamine in the District of New Jersey and elsewhere, contrary to 21 U.S.C. S 841(a)(1). Several of the defendants filed motions to suppress the physical evidence seized by the police. On August 18, 1999, the District Court conducted a hearing on the motions to suppress, and on September 10, 1999, the District Court issued a letter opinion denying all of the suppression motions.

_____

1. The indictment charged Appellants Perez, Alcantera, and Batoon, as well as Lirio Del Rosario, Augustin Daluro, Roland Abaia, Prajedo Almiranez, and Arturo Zoletta.

On August 16, 1999, prior to the District Court's ruling on the suppression motions, Daluro pled guilty to the indictment pursuant to a cooperation and plea agreement with the Government. On October 20, 1999, Del Rosario pled guilty to the indictment pursuant to a plea agreement that did not require his cooperation with the Government. On the same day, Zoletta and Almiranez also pled guilty to the indictment pursuant to cooperation agreements with the Government.

The remaining defendants -- Perez, Alcantera, Batoon, and Abaia -- were tried jointly on the charge in the indictment. At trial, Daluro,[2] Zoletta, Almiranez,[3] and Uy,[4] an unindicted co-conspirator, all testified on behalf of the Government. Alcantera was the only defendant to testify. In its motion for acquittal at the close of the Government's case, the defense made a general application claiming that the Government did not produce credible evidence to sustain a conviction. The motion did not specifically raise venue as a disputed issue, i.e., whether the trial should have occurred in the District of New Jersey. The District Court denied the motion, responding: "The Court determines that there is indeed . . . sufficient evidence for

_____

2. Daluro testified that he distributed methamphetamine for Del Rosario in New Jersey and traveled to Del Rosario's apartment in New York to pick up the drugs. He frequently saw Almiranez, who also lived in Jersey City, New Jersey, with Del Rosario. Daluro testified further that he occasionally encountered Batoon in Del Rosario's apartment when he went there to pick up drugs, and that Del Rosario typically had a lot of methamphetamine in his apartment. Daluro also testified that Alcantera had been to his residence in Jersey City, New Jersey in late January 1999 to buy drugs for Del Rosario.

3. Almiranez testified that he sold the methamphetamine he obtained from Del Rosario to others to resell in Jersey City, New Jersey. Almiranez also testified that in 1998 he observed Del Rosario give between 10 and 100 grams of methamphetamine to Appellants Batoon and Alcantera in each of their respective homes.

4. Uy testified that in the Fall of 1998, while in Del Rosario's apartment, he saw Del Rosario give drugs to Batoon in exchange for a "wad" of what appeared to be twenty dollar bills. Uy testified further that in March 1999, while the two were incarcerated in Queens House, a men's detention center in Queens, Alcantera boasted to him that he was one of Del Rosario's sellers.

9

the jurors to find beyond a reasonable doubt both the existence of the conspiracy charged in the indictment and the participation and membership of each of the defendants on trial in that conspiracy." At the jury charge conference and following the charge, the defendants requested that the District Court instruct the jury on venue. The District Court denied this request.

On November 11, 1999, the jury returned guilty verdicts against Perez, Alcantera, and Batoon, and acquitted Abaia. Appellants moved for a new trial, arguing that the District Court should have submitted the question of venue to the jury. The District Court denied this motion, but cautioned:

> If indeed I am wrong and the law to be applied to this case is such that this was a matter that should have been submitted to the jury upon a defense request, upon submission of the jury instructions, then I would not conclude the Court's decision to do otherwise is harmless error. I think the evidence, in other words, as to the presence of venue in the District of New Jersey is not so overwhelming that the jury couldn't have decided otherwise had it been before it.

The District Court conducted sentencing hearings in March 2000, and imposed sentences at or near the bottom of the applicable Sentencing Guideline ranges for each defendant.5 The Appellants filed timely appeals, which are consolidated before us. We have jurisdiction to hear their appeals pursuant to 28 U.S.C. S 1291.

II. Failure to Instruct the Jury on Venue

Appellants claim that the District Court erred when it failed to instruct the jury whether the District of New Jersey was the proper venue for their trial, as was alleged in the indictment. As set out above, the crimes alleged with respect to Appellants appear on their face to have occurred primarily within New York City. The Government's evidence tying the conspiracy to New Jersey consisted of the testimony of Uy, an unindicted co-conspirator, and of

_____

5. The District Court sentenced Perez to a term of imprisonment of 235 months. It sentenced Alcantera to 190 months, and Batoon to 152.

10

Daluro, Zoletta, and Almiranez, all of whom pled guilty, that they conducted their part of the drug operation in New York and New Jersey and encountered Appellants Alcantera and Batoon buying drugs from and for Del Rosario.

We hold that, where the indictment alleges venue without a facially obvious defect, the failure to instruct the jury to determine whether that venue is proper is reversible error only when (1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction. Because the first and second prerequisites were unmet here, the District Court did not err in failing to instruct the jury on venue. Our reasoning for this rule and our conclusion in this case are discussed below.

A defendant in a criminal trial has a constitutional right to be tried in the district in which the crime was committed. Proper venue is a safeguard that is guaranteed twice in the Constitution. Article III, Section 2, Paragraph 3 declares that "[t]he Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed . . . ." U.S. Const. art. III, S 2, c. 3. The Sixth Amendment to the Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."6 U.S. Const. amend. VI; see

_____

6. The framers, explained Justice Frankfurter in United States v. Johnson, 323 U.S. 273, 275 (1944), wrote the first of these provisions into the Constitution because they were "[a]ware of the unfairness and hardship to which trial in an environment alien to the accused exposes him . . . ." The second provision, providing the"State and district" from which the jury is to be drawn, serves as a reinforcement to the first "[a]s
though to underscore the importance of this safeguard." Id.

The provision in Article III is literally a venue provision because it fixes
the place of trial, whereas the Sixth Amendment is a vicinage guarantee because it determines from where the jurors in a criminal trial shall be selected. "This distinction, however, has never been given any weight, perhaps because it is unlikely that jurors from one district would be asked to serve at a trial in another district, or perhaps, more importantly, because the requirement . . . presupposes that the jury will sit where it is chosen." United States v. Passodelis, 615 F.2d 975, 977 n.3 (3d Cir. 1980).

United States v. Baxter, 884 F.2d 734, 736 (3d Cir. 1989). The Government has the burden of proving that venue is proper. United States v. Black Cloud, 590 F.2d 270, 272 (8th Cir. 1979).

In 1944, Congress embedded the constitutional venue guarantee in the Federal Rules of Criminal Procedure. Rule 18 states that "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. . . ." That same year, the United States Supreme Court, in the landmark case United States v. Johnson, 323 U.S. 273 (1944), underscored the importance of safeguarding the constitutional guarantee of proper venue in criminal trials.

> These are matters that touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests. These are important factors in any consideration of the effective enforcement of the criminal law. . . . Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed.

Johnson, 323 U.S. at 276.

Despite its basis in the Constitution, venue in the criminal context continues to occupy a lesser station in the hierarchy of constitutionally-derived rights. The issue of proper venue in a criminal proceeding can be waived by a defendant. See United States v. Turley, 891 F.2d 57, 63 (3d Cir. 1989); United States v. Sandini, 803 F.2d 123, 127 (3d Cir. 1986), cert. denied sub nom. Moody v. United States, 479 U.S. 1093 (1987). Further, the standard for finding a waiver of venue is less rigorous than that for finding a waiver of the rights to trial by jury, to confront one's accusers and to be free from self-incrimination. See Boykin v. Alabama, 395 U.S. 238 (1969); Sandini, 803 F.2d at 127. In Sandini, we observed that "[o]bjections to venue are waived if not raised in a timely manner." What is timely depends on whether the alleged error is clear from the indictment. Where an indictment alleges venue on its face without an obvious defect, "the defendant has no notice

12

that a facially proper allegation of venue is in fact defective, and thus there can be no waiver until the close of the government's case." Id.

Under Rule 18 of the Federal Rules of Criminal Procedure, Congress has the power to lay out the elements of a crime to permit prosecution in one or any of the districts in which the crucial elements are performed. See United States v. Flaxman, 304 F. Supp. 1301 (S.D.N.Y. 1969) (referencing Travis v. United States, 364 U.S. 631 (1961)). Pursuant to this power, Congress has modified the venue safeguards by statute to fit the situation of conspiracy. "[A]ny offense . . . begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. S 3237(a).

In addition, venue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy.

> We see no reason why a constructive presence should not be assigned to conspirators as well as to other criminals; and we certainly cannot assent to the proposition that it is not competent for Congress to define what shall constitute the offense of conspiracy or when it shall be considered complete, and do with it as with other crimes which are commenced in one place and continued in another.

Hyde v. United States, 225 U.S. 347, 363-64 (1912); see also United States v. Ochoa, 229 F.3d 631, 636 (7th Cir. 2000) (stating the traditional rule that a conspiracy charge may be tried in any district in which an overt act of conspiracy occurred); United States v. Dabbs, 134 F.3d 1071, 1078 (11th Cir. 1998) (holding that in a conspiracy case venue lies where the conspiracy agreement was formed or in any jurisdiction where an overt act in furtherance of the conspiracy was committed by any of the conspirators); U.S. v. Bascope-Zurita, 68 F.3d 1057, 1062 (8th Cir. 1995) (same); United States v. Al-Talib, 55 F.3d 923, 928 (4th Cir. 1995) (same); United States v. Record, 873 F.2d 1363, 1366 (10th Cir. 1989) (same).

13

It is against this backdrop that we consider the Appellants' assertion that the District Court committed reversible error when it failed to instruct the jury on venue, both after a request by defendants at the charge conference and following the charge. The specific issue raised by Appellants is whether proof of venue in a multi-district indictment for conspiracy is a determination of fact that must be submitted to a properly instructed jury upon defendants' request. This precise question has not been considered by this Court, although several other courts of appeal have formulated varying rules governing when a trial court must instruct the jury on venue. To resolve this issue, we must make the threshold determinations of whether venue is an element of an offense and, if so, whether it presents a factual or legal question.

A. Is Venue an Element of an Offense?

Federal courts of appeals often state that venue is an element of every offense. See, e.g., United States v. Miller, 111 F.3d 747 (10th Cir. 1997); United States v. Winship, 724 F.2d 1116, 1124 (5th Cir. 1984); United States v. White, 611 F.2d 531, 536 (5th Cir.), cert. denied, 446 U.S. 992 (1980); but compare United States v. Maldonado-Rivera, 922 F.2d 934, 969 (2d Cir. 1990) (rejecting defendants' attempt to challenge venue based on supposed omission in the counts with which they had been charged and stating that "[v]enue, however, is not an element of the offense"). In general, "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." United States v. Gaudin, 515 U.S. 506, 522–23 (1995).

Further inquiry, however, reveals that the term "element" lacks its usual force in the context of venue. What the courts give criminal defendants on this issue with one hand they frequently take away with the other. When courts describe venue as an element, they often distinguish it from "substantive" or "essential" elements. See United States v. Kaytso, 868 F.2d 1020, 1021 (9th Cir. 1988); United States v. Griley, 814 F.2d 967, 973 (4th Cir. 1987); Miller, 111 F.3d at 749; Wilkett v. United States, 655 F.2d 1007, 1011 (10th Cir. 1981). The Fifth Circuit has explained that while

14

venue is an element, it will be protected less vigorously than other elements. See Winship, 724 F.2d at 1124. Likewise, the Seventh Circuit has recognized that while one may call venue an element, "it is an element more akin to jurisdiction than to the substantive elements of the crime." United States v. Massa, 686 F.2d 526, 530 (7th Cir. 1982) (citing White, 611 F.2d at 536). Put another way, "[v]enue is wholly neutral; it is a question of procedure, more than anything else, and it does not either prove or disprove the guilt of the accused." Wilkett, 655 F.2d at 1011.

In keeping with venue's Boswellian status as a criminal element, courts require a lesser standard of proof than with regard to the other elements of an offense -- a preponderance of the evidence rather than beyond a reasonable doubt.7 See, e.g., United States v. Barsanti, 943 F.2d 428 (4th Cir.), cert. denied, 503 U.S. 936 (1991); United States v. Gonzalez, 922 F.2d 1044, 1054-55 (2d Cir.), cert. denied, 502 U.S. 1014 (1991); United States v. Taylor, 828 F.2d 630 (10th Cir. 1987); Winship, 724 F.2d at 1124; United States v. Males, 715 F.2d 568 (11th Cir. 1983); Massa, 686 F.2d at 531; United States v. Davis, 666 F.2d 195 (5th Cir. 1982); United States v. Haley , 500 F.2d 302, 305 (8th Cir. 1974); United States v. Powell, 498 F.2d 890 (9th Cir.), cert. denied, 419 U.S. 866 (1974); 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 307 (3d ed. 2000). Our Court now explicitly joins those courts in adopting the preponderance standard for venue, a question which we reserved in United States v. Passodelis, 615 F.2d 975, 977 n.4 (3d Cir. 1980).

We agree with the Seventh Circuit that venue is"an element more akin to jurisdiction than to the substantive elements of the crime." Massa, 686 F.2d at 530; White, 611 F.2d at 536. In this context, although an element strictly speaking, venue does not automatically present a question for the jury. We deal below with when it does.

_____

7. The Tenth Circuit has pointed out that the Supreme Court in Gaudin did not have occasion to address the proper treatment of a nonsubstantive element like venue. Miller, 111 F.3d at 749-50 (citing Gaudin, 515 U.S. at 509 n.1).

B. When Must a Jury Instruction on Venue Be Given?

Appellants contend that whether venue is proper is always an issue of fact for the jury to decide. The Government, however, argues that where venue is not disputed at trial, the court may properly find it as a matter of law without submitting the issue to the jury. This is so, it argues, even if venue might have been in genuine dispute had it been raised at trial.8 We considered this fact versus law distinction in Passodelis and held that"the question of venue at issue here is a matter of law." 615 F.2d at 978. The defendant in Passodelis was convicted of violating federal law by making contributions to then-Governor Milton Shapp's presidential campaign in excess of the campaign limit and in the name of another person. There was no dispute that Governor Shapp's campaign headquarters were located in the Middle District of Pennsylvania and that contributions were deposited there. Proper venue turned on the question of "whether there [was] evidence in the record which will support a finding that acts which constitute elements of the crimes were committed by Passodelis in the Middle District." Id. We ruled that the Government did not provide sufficient evidence to meet its burden of establishing that venue was proper. Id. The majority opinion distinguished the dissent, which argued that venue in that case was "wholly factual [in] nature," id. at 979, as follows:

> The dissent is certainly correct in characterizing the central issue in dispute in this case as a factual one. However, we are concerned that the dissent misapprehends the nature of our inquiry. The dissent asserts that we substitute our own "verdict of acquittal." However, we are not reviewing whether there was sufficient evidence upon which a jury could have found Passodelis guilty, but rather whether there was

_____

8. The only Supreme Court case addressing the fact versus law distinction with respect to venue dates to 1861. In United States v. Jackalow, 66 U.S. 484 (1861), the Supreme Court ruled that for purposes of determining whether venue existed in one district for a piracy conviction, the existence of a border dispute between states, affecting the determination of where the acts actually occurred, did not provide a basis to conclude that those acts occurred within that district.

16

sufficient evidence upon which the district court could have found that crimes were committed by Passodelis in the Middle District. In fact, it is completely unnecessary for us to call into question any of the jury's findings since there is no factual inconsistency between the jury having found that Passodelis committed the crimes for which he was convicted and our determination that the evidence was insufficient to support a finding that crimes were committed by Passodelis in the Middle District. The two inquiries are, on the facts of this case, entirely separate. . . . [Moreover,] the determination as to whether there was sufficient evidence to support a finding that crimes were committed by Passodelis in the Middle District is a question of law, not of fact.

Id. at 978 n.6 (emphasis added).[9]

Nine years later, in United States v. Baxter, we repeated substantially the underscored language from Passodelis in concluding that "the question of venue at issue here is a matter of law. . . ." 884 F.2d 734, 736 (3d Cir. 1989). In Baxter, the defendant was convicted of five counts of receiving an illegal gratuity while a public official. It was not disputed that Baxter received the illegal payments (by way of checks drawn on a bank account in Pennsylvania, deposited in his bank in Arlington, Virginia), at his home in Reston, Virginia, and that the checks were presented for payment by the Virginia bank at the bank in Jenkintown, Pennsylvania. Id. Permissible venue turned on the legal question of whether this scenario constituted a continuing offense such that prosecution was proper either in the applicable district where the checks were deposited (Virginia) or where the checks were paid (Pennsylvania). Considering the individualized acts of the defendant and the continuing nature of the offense, we concluded that venue was proper. Id.

_____

9. We did not decide, however, the standard of proof (beyond reasonable doubt or preponderance of the evidence) for determining venue because "under either standard . . . the government has not met the burden." Id. at 978 n.4.

17

We continued the theme that, at least initially, the "district court's decision regarding proper venue was an interpretation of law . . ." in United States v. Palma–Ruedas, 121 F.3d 841 (3d Cir. 1997), reversed on other grounds sub nom. United States v. Rodriguez–Moreno , 526 U.S. 275 (1999). The venue question in Palma–Ruedas was whether "the government [can] try a defendant for using or carrying a firearm in any venue where it may try the related crime when the defendant neither carried nor used the firearm in that venue." Palma–Ruedas, 121 F.3d at 848. It was undisputed that the defendant only carried or used the firearm in Maryland. Deciding the legal question, we determined that venue in New Jersey was improper. Id. at 850–51.

Turning to this case, the District Court, in ruling on the venue issue raised by the defense for the first time at the jury charge conference, relied on our declarations in Baxter and Palma–Ruedas that venue was a matter of law. In discussing these cases, the District Court noted orally:

> [T]he determination of criminal venue is a matter for the court, is a matter of law, and not for the jury as a matter of fact.
>
> So with that reaffirmation of the strength of the Baxter rule, although in a slightly different context, this Court determines that it will not instruct the jury on the question of venue. Furthermore, the Court determines at this juncture that there is certainly sufficient evidence of proper venue in this district with regard to all of the defendants. So that if faced with a motion at this juncture to dismiss the case for lack of proper venue, that motion would be denied.

We take issue with the District Court's reading of our line of venue decisions to the extent that it concludes that venue can never pose an issue of fact that should be submitted to a jury. The trial judge is the gatekeeper at trial, and in so acting determines as a matter of law whether there are sufficiently disputed issues of material fact to be decided by the jury. In Passodelis , we were able to rule as a matter of law because we were reviewing the legal question of "whether there was sufficient evidence

18

upon which the district court could have found that crimes were committed . . . in the . . . District." Passodelis, 615 F.2d at 978 n.6 (emphasis added). In Baxter and Palma-Ruedas, we could rule as a matter of law because the necessary facts were established and only the legal question of how broadly we would define venue remained. Baxter, 884 F.2d at 736; Palma-Ruedas, 121 F.3d at 848. Thus, in Baxter, whether checks were presented for payment in Jenkintown, Pennsylvania would have been a factual inquiry affecting venue had it been in dispute, but it was not. Similarly, in Palma-Ruedas, whether the defendant carried a firearm in New Jersey would have raised a fact question affecting venue except that the Government conceded that the defendant had never done so. Instead it argued that venue in New Jersey was proper as a matter of law because the predicate offense of kidnapping had taken place in part in that state.

In this case, the District Court found sufficient evidence existed to show as a matter of law that venue in New Jersey was suitable, i.e., congruent with some aspect of the conspiracy crime being committed in New Jersey. This was a proper determination for the Court to make.10 As noted below, the Government's evidence on the matter was sufficient to establish venue by a preponderance, and Appellants did not interpose evidence at trial to raise a material dispute over this issue such that it needed to be resolved by the jury. In this context, it was not unlike the undisputed threshold issues of fact in Baxter  and Palma-

_____

10. Several Courts recognize that venue can be"a question of fact" that ordinarily must be decided by the jury. United States v. Miller, 111 F.3d 747, 749 (10th Cir. 1992) (citing United States v. Rinke, 778 F.2d 581, 584 (10th Cir. 1985)); United States v. Record , 873 F.2d 1363, 1370 (10th Cir. 1989); United States v. Winship, 724 F.2d 1116, 1124 (5th Cir. 1984); United States v. Black Cloud, 590 F.2d 270, 272 (8th Cir. 1979) ("Whether the receipt of the firearm in question occurred in the District of North Dakota, so that venue in that district was proper, was a question of fact for the jury."); Green v. United States, 309 F.2d 852, 856 (5th Cir. 1962); United States v. Gillette, 189 F.2d 449, 452 (2d Cir. 1951)). But this does not mean that every venue determination presents a jury question. For whether sufficient evidence exists to support a finding that crimes were committed in New Jersey is a question of law for the court. See Passodelis, 615 F.2d at 978 n.6.

19

Ruedas. Put another way, proper venue in a criminal case may pose a question of fact for the jury if venue is in issue and meets procedural trip points.

When then is venue genuinely in issue, particularly in the context of conspiracy? This question has not been addressed directly by this Court, although in United States v. Turley, 891 F.2d 57, 60 (3d Cir. 1989), United States v. Sandini, 803 F.2d 123 (3d Cir. 1986), and United States v. Polin, 323 F.2d 549 (3d Cir. 1963), we addressed the broader question of when the failure to object to venue results in the defendant waiving the issue altogether. What we consider here is not simply when a defendant waives his right to challenge venue completely, but when venue presents a fact question for the jury as opposed to a question of law for the court.

The precise issue of when venue is "in issue" so as to raise a fact question for the jury is one on which our sister courts of appeal differ. The more narrow view, followed by the Fifth and Seventh Circuits, holds that venue is not in issue unless it is actually disputed at trial. See Winship, 724 F.2d at 11125–26; Massa, 686 F.2d at 529–31. But the Tenth Circuit holds that "failure to instruct[the jury] on venue, when requested, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue." Miller, 111 F.3d at 751. Straddling these opposing positions are the Fourth and Eighth Circuits, which hold, on the one hand, that venue is in issue whenever defendants might otherwise be convicted"of the offenses charged without an implicit finding that the acts used to establish venue had been proven," United States v. Martinez, 901 F.2d 374, 376 (4th Cir. 1990); United States v. Moeckly, 769 F.2d 453, 461 (8th Cir. 1985), which is the Tenth Circuit's position, but on the other hand have found harmless the refusal by the trial court to instruct on venue because evidence that criminal acts occurred in the applicable districts was substantial and uncontroverted. Martinez, 901 F.2d at 376–77; Moeckly, 769 F.2d at 462.

In Massa, the Seventh Circuit adopted an"in issue" rule that looks to whether trial testimony established venue as a disputed issue of fact. It concluded that the trial court did

20

not err "in denying a specific venue instruction where the issue of venue was not disputed" at trial. 686 F.2d at 531. The trial court ruled that venue had been established as a matter of law based on (1) the sufficiency of the Government's proof that venue existed in the Northern District of Indiana as per the indictment, and (2) the fact that Massa did not contest venue by presenting any contrary evidence. Id. The Appeals Court affirmed and stated that "[w]here venue is not in issue, no court has ever held that a venue instruction must be given." Id. at 530.

In Winship, the Fifth Circuit followed a harmless error analysis, though it nonetheless noted that trial testimony is a precondition to putting venue in issue. There the defendants were charged with, among other counts, conspiracy to possess with the intent to distribute marijuana and methamphetamine in Texas, Oklahoma, and Louisiana. Although neither defendant was present in the Western District of Louisiana where venue was laid, the trial testimony of several indicted co-conspirators connected them with distribution activities in that district. Id. at 1120. On appeal, the Fifth Circuit addressed whether the trial testimony put venue genuinely in issue. It concluded that the uncontroverted evidence that the charged drug activity occurred in the Western District of Louisiana was so overwhelming that trial testimony did not put venue "in issue." Id. at 1125. Therefore, the trial court's failure to instruct the jury in that case was harmless error. The Fifth Circuit nonetheless admonished against the trial court's failure to give the venue instruction, noting that "the better procedure is to give the venue instruction when requested, regardless of whether the trial court believes trial testimony has put venue in issue." Id. at 1126 n.13.

We find the approach to the "in issue" test formulated by the Fifth and Seventh Circuits to be more persuasive than the broader view taken (at least theoretically) by the Fourth, Eighth and Tenth Circuits. Venue cannot be in issue unless the parties actually dispute it. It is an element "more akin to jurisdiction than to the substantive elements of the crime." Massa, 686 F.2d at 530. Moreover, objections to venue are waived if not raised in a timely manner. Sandini, 803 F.2d at 127. An issue that has been waived because no

one has objected to it should not at the same time be "in issue" so as to require a jury instruction. That paradoxical result, however, appears to be the upshot of a broad"in issue" rule. Moreover, the reality that the Fourth and Eighth Circuits have followed conclusions that venue was properly "in issue" with harmless error analyses affirming the decision not to submit the question to the jury demonstrates the efficiency of requiring parties to bear the consequences of their own inaction.

We conclude that, where the indictment alleges venue without a facially obvious defect, if (1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction, venue becomes a jury question and the court must specifically instruct the jury on venue.11 These three requirements are separate. The purpose of objecting to venue prior to or at the close of the prosecution's case is to alert the prosecution to the issue and thereby avoid waiving it under Sandini and Polin. A defendant may object to venue by raising its absence in a pre-trial motion, challenging during the Government's case its evidence as to venue, or making a motion for acquittal at the close of the Government's case that specifically deals with venue.

Even if a defendant properly objects to venue, however, it does not become a fact question for the jury unless the defendant also places it in issue by establishing a genuine issue of material fact with regard to venue. Trial testimony may place venue in issue at any time prior to the close of evidence.12

_____

11. While we hold that the trial court was not required to give a venue instruction under the facts of this case, the better practice is to give the
instruction when requested. This is especially the preferred course in this case, where the trial judge later offered that"the evidence . . . as to
the presence of venue in the District of New Jersey is not so overwhelming that the jury couldn't have decided otherwise had it been before it."

12. Our ruling that venue is in issue if the defendant does no more than introduce direct evidence during the defense presentation does not run

22

When either the time for a venue objection or the opportunities to establish the facts placing venue in issue pass unavailed, venue is waived even if a jury instruction is requested. Objecting to venue at the jury instruction phase, without more, is not sufficient, for it does not flag and establish an issue of fact that warrants a special jury instruction. As the Seventh Circuit noted in Massa, "where venue is not in issue, no court has ever held that a venue instruction must be given." 686 F.2d at 530. Furthermore, we agree with the Court in Massa that "where venue is not disputed and the Government presents sufficient evidence of venue . . . ", it is a matter "particularly suited to determination by the court as a matter of law." Id. at 531. Finally, as a procedural matter, a defendant who has both properly objected to venue and placed it in issue must also timely request a jury instruction on it.

We now apply this rule to the facts of the case before us. Here we have an unchallenged indictment that alleges a conspiracy in New Jersey, buttressed by trial testimony of two alleged co-conspirators that overt acts in furtherance of the conspiracy occurred in New Jersey.13  No countervailing evidence was introduced by the Appellants nor did they at or before trial challenge the Government's case in any way. Instead, they now counter merely that the Government's

_____

afoul of the rule in Sandini, 803 F.2d at 127, that, where the indictment alleges facially valid venue, objections to venue are waived if not raised at or before the close of the Government's case. The timing cutoff of Sandini and Polin refers to when the defendant must object to venue. Having made a timely objection, the defendant normally needs to present testimony that places venue in issue at any time prior to the close of evidence. Alternatively, the court may find that the Government's testimony places venue in issue notwithstanding the defense presentation.

13. This begs the question of what happens if the Government previously alleged venue in the indictment but offered no testimony at trial proving venue. If no defense objection is raised at or before the close of the Government's case, Sandini and Polin instruct that, notwithstanding the lack of prosecution testimony, the venue defense is waived. This "give[s] the government an opportunity . . . to provide additional proof, if possible, to cure an insufficient presentation on venue." Turley, 891 F.2d at 61.

23

proof of venue rests entirely on testimony from alleged co-conspirators. The Government cites the Fifth Circuit's decision in Winship to support the view that testimony from admitted co-conspirators can sufficiently support a finding of venue as a matter of law. 724 F.2d at 1120. We agree. The Government in this case met the minimum requirements.

We conclude that the District Court's refusal to instruct the jury on venue, based on the facts of this case, was not in error despite the defense request for a jury instruction. Appellants' general application for acquittal at the close of the Government's case claiming that the Government did not produce credible evidence to sustain a conviction, which would have been timely, failed to alert the Government and the Court specifically to the alleged impropriety of venue. Moreover, trial testimony failed to put venue in issue by creating a genuine issue of material fact that required resolution by a jury. Appellants offered no objection to the indictment, which clearly alleges a conspiracy in the District of New Jersey. Nor did Appellants challenge or contradict (by cross-examination or evidence introduced during the defense presentation) the venue testimony of the indicted co-conspirators offered by the Government, which recalled specific overt acts in furtherance of the conspiracy in New Jersey.14 In this context, the request for a jury instruction on venue was too little and too late.

III. Suppression of Evidence

Appellants argue that the District Court erred in denying their motions to suppress evidence seized in violation of their Fourth Amendment right against unreasonable

_____

14. The District Court, in its denial of the defense motion for a new trial,
stated that "the evidence . . . as to the presence of venue in the District
of New Jersey is not so overwhelming that the jury couldn't have decided otherwise had it been before it." Given the absence of a dispute of material fact, "overwhelming" evidence was not necessary for the District Court to conclude that the Government's burden was met. The testimony of co-conspirators in this case was sufficient to support venue in New Jersey.

24

searches and seizures. According to Appellants, neither the exigent circumstances exception to the warrant requirement nor the independent source doctrine, both relied upon by the District Court in its denial, apply here. This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts. United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998).

As a threshold matter, Appellants have demonstrated no privacy interest in Del Rosario's apartment that would permit them to claim the protection guaranteed by the Fourth Amendment as to the items seized from it. Thus they lack the capacity to move to suppress the evidence seized. Nor does their claim that the seizure of items from them personally violates the Fourth Amendment survive either a harmless error analysis or the independent source doctrine. We conclude that probable cause to secure a search warrant existed prior to the officers' entry of Del Rosario's apartment15 and that the independent source doctrine applies to the items seized. Therefore, we affirm the District Court's ruling on the suppression motion.

A. Capacity of Appellants to Claim the Protection of
        the Fourth Amendment

The Fourth Amendment guarantees

> the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV. In its denial of Appellants' motion to suppress, the District Court determined that the issue of

_____

15. Although we have doubts about the District Court's finding that exigent circumstances were present to justify the arresting officers' decision to enter and secure the premises, we need not address this issue in view of our conclusions on the lack of a privacy interest and the independent source doctrine.

25

their "standing" was moot in light of the Court's decision on the merits that no Fourth Amendment violation occurred.

We may affirm the rulings of the District Court for any proper reason that appears on the record even where not relied on by it. United States v. Miller, 224 F.3d 247, 248 (3d Cir. 2000). We address the capacity issue here because we think it falls squarely within the Supreme Court's holding in Minnesota v. Carter, which declared that the " `capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " 525 U.S. 83, 88 (1998) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)). Under this rule, persons in another's apartment for a short time for the business purpose of packaging cocaine had no legitimate expectation of privacy in that apartment. Thus any search which may have occurred did not violate their Fourth Amendment rights. Id. at 91. Although overnight guests who are legitimately in a third-party's apartment may have a reasonable expectation of privacy, Appellants do not qualify. See Minnesota v. Olsen, 495 U.S. 91, 98-99 (1990). Perez, a resident of Virginia, was booked at the Queens Motor Inn. She actually stayed at Batoon's home the night before the arrest. She did not stay overnight at Del Rosario's apartment. Nor was there any evidence that either Alcantera or Batoon resided at or were staying overnight at Del Rosario's apartment.

Appellants cite to United States v. Erwin, in which the Tenth Circuit ruled, in the context of an automobile stop and search, that "[e]ven if defendant lacks standing16 to

_____

16. In Rakas the Supreme Court opined that "the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure . . . belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing. . . ." 439 U.S. at 140. To some this may seem a distinction without a difference. See United States v. Felton, 753 F.2d 256, 259 n.1 (3d Cir. 1985) ("The question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have

26

challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion under the `fruit of the poison tree' doctrine." 875 F.2d 268, 269 & n.2 (10th Cir. 1989) (citing Wong Sun v. United States, 371 U.S. 471, 484 (1963)). The rationale of Erwin , however, does not apply in this context. Instead, we find the reasoning of Justice Kennedy in his concurrence in Carter to be on point. He posed the following hypothetical where the entry was illegal: "If respondents here had been visiting twenty homes, each for a minute or two, to drop off a bag of cocaine and were apprehended by a policeman wrongfully present in the nineteenth home, . . . we would have said that Rakas compels the rejection of any privacy interest respondents might assert." 525 U.S. at 102 (Kennedy, J., concurring); Rakas, 439 U.S. at 143.

In sum, we find no evidence that the Appellants were at Del Rosario's apartment for any purpose other than to engage in drug-related activities. They therefore have no reasonable expectation of privacy in Del Rosario's apartment to challenge the items seized therefrom under the Fourth Amendment and their claims are rejected on that basis. See United States v. Vega, 221 F.3d 789, 797 (5th Cir. 2000) (rejecting appellant's challenge of a search where he presented no evidence to meet his burden of showing that he had a legitimate expectation of privacy in the residence searched).

Alcantera and Batoon also argue, and the Government concedes, that they had a reasonable expectation of privacy with respect to the items seized from them personally. From Alcantera the Government seized a cell phone with battery and a pager; from Batoon a small amount of methamphetamine consistent with personal use and a pager. However, in light of all of the other evidence properly

_____

come out differently. . . ."); see also United States v. Baker, 221 F.3d 438
(3d Cir. 2000) (using "standing" interchangeably with "reasonable expectation of privacy" in discussing the right to challenge the search of a car). Nonetheless, "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment rather than on any theoretically separate, but invariably intertwined concept of standing." Felton, 753 F.2d at 259 n.1.

seized from Del Rosario's apartment pursuant to the search warrant (see discussion below), any alleged error in the admission of this evidence is rendered harmless. See United States v. Price, 13 F.3d 711, 720 (3d Cir. 1994) (finding harmless the erroneous denial of a motion to suppress fourteen kilograms of cocaine in light of the testimony of several witnesses that appellant delivered cocaine for distribution, wore a ring associated with a drug-trafficking organization, and worked with members of that organization).

B. Independent Source Doctrine and Probable Cause

The District Court denied Appellants' motion to suppress evidence based in part on the long-standing independent source doctrine. That doctrine serves as an exception to the exclusionary rule and permits the introduction of illegally obtained evidence where the police had an independent source for the discovery of the evidence.

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others.

Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920); see also Segura v. United States, 468 U.S. 796, 805 (1984) (noting that evidence is not to be excluded if police had an independent source); Wong Sun v. United States, 371 U.S. 471 (1963) (same). The basis for the rule is the well-established principle that "evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is `so attenuated as to dissipate the taint'." Segura, 468 U.S. at 797 (citing Nardone v. United States, 308 U.S. 338, 341 (1939)).

The facts and legal issues presented in this case are similar to those in Segura. There, New York Drug Enforcement Task Force agents began surveillance of Segura based on information that he and another petitioner

28

were "probably" trafficking in cocaine from their apartment. 468 U.S. at 799. After observing the delivery of a bulky package suspected to be cocaine as per an informant's tip, the officers stopped the recipient couple, found them to possess cocaine, and placed them under arrest. From this couple, the officers learned that they had purchased cocaine from Segura. Given that Segura was to call the couple at approximately 10:00 p.m. to learn if they had sold the cocaine, and that because of the lateness of the hour a search warrant could not be obtained, the officers decided to "secure" Segura's apartment to prevent destruction of the evidence. The officers knocked and entered without the consent of the woman who opened the door. They conducted a limited security check while others went to obtain a search warrant. After nineteen hours, the warrant was issued and the search performed. In concluding that probable cause existed, although not ruling on the lower courts' conclusion that the entry and initial search were not justified by exigent circumstances, the Supreme Court held that

> the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as `fruit' of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence . . . .

468 U.S. at 799.

The Supreme Court did not answer directly the question presented by this case -- whether probable cause exists if it was not clearly established that drugs were in the apartment. But it did conclude that probable cause existed under the facts of that case, and noted that "[t]he illegality of the initial entry . . . has no bearing on . . . whether the evidence first discovered during the search of the apartment pursuant to a valid warrant issued the day after the entry should have been suppressed as `fruit' of the illegal entry." Id. at 798. But see United States v. Dice, 200 F.3d 978 (6th Cir. 2000) (holding that violation of knock-

29

and-announce rule during execution of valid search warrant warranted suppression of evidence seized in search following violation).

Our case law follows the reasoning in Segura. In United States v. Herrold, we found that the affidavit for the warrant in question contained sufficient probable cause to justify the search apart from information the officers learned in the initial entry. 962 F.2d 1131 (3d. Cir. 1992).

> In sum, the district court should have asked two questions: (1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search prompted the officers to obtain the search warrant. If the answers to these questions are yes and no respectively, which they are in this case, then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible. Otherwise the police would indeed be in a worse position than they would have been in had they not violated Herrold's Fourth Amendment rights.

Id. at 1144. Our ruling in Herrold harmonized the tainted warrant and independent source doctrines. See id. In response to the fear that police will have an incentive to avoid the warrant requirement, we noted that the independent source doctrine

> by its very nature . . . is only applicable where the police have in fact obtained a warrant. In addition, it will not give the police incentive to search first without a warrant, because any information discovered in an unlawful search is useless to the police in a subsequent warrant application. Moreover, our result is dependent upon our conclusion that the police would have obtained the warrant even if Hill had not made his original entry.

Id. This reasoning applies with equal force to the case before us.

Thus we turn to whether the tainted information from the illegal entry improperly influenced the issuing of the

warrant. The Court in United States v. Restrepo , 966 F.2d 964 (5th Cir. 1992), was presented with a warrantless security sweep of a residence and the subsequent search of that same residence pursuant to a warrant. It held that "in all such cases the district court should consider whether the warrant affidavit, once purged of tainted facts and conclusions, contains sufficient evidence to constitute probable cause for issuance of the warrant." Id. at 970. Separate and apart from this determination, the court must also determine "whether information gained through the illegal search influenced or motivated the officers' decision to procure a warrant." Id. at 971. This latter point resulted in a remand to the district court.

In our case, Officer Koehler testified during the suppression hearing that he had enough probable cause based on the information provided from CI-1 and Zoletta to convince an Assistant District Attorney to issue him the search warrant even if he had never gone into the apartment. But during his testimony Koehler acknowledged that the affidavit in support of the search warrant included things seen in the apartment after an entry not justified by exigent circumstances (and therefore tainted).

> Q: You included in that affidavit, did you not, the things you or others had seen in that apartment?
>
> A: Yes.
>
> Q: You included the methamphetamine that was in plain view in the living room?
>
> A: Right.
>
> Q: Did you include those things because you felt they were substantial information towards getting the search warrant?
>
> A: They would just be more helpful, more information.

We nonetheless conclude that probable cause for the search warrant existed before the officers decided to enter Del Rosario's apartment. See Illinois v. Gates , 462 U.S. 213, 238 (1983). Similar to the situation in Segura , the officers in this case had the apartment under surveillance based on tips from confidential informants that Del Rosario was

31

trafficking methamphetamine from his apartment. The officers were also informed that a woman named "Linette" would be arriving at J.F.K. Airport from the Philippines with bulky packages on February 24, 1999. This information and Linette's description were corroborated by customs agents. While surveilling Del Rosario's apartment the next day, officers observed a stream of cars stop outside the apartment building, remain for a few minutes, then leave. In similar fashion, Zoletta and Abaia then pulled up and parked outside the apartment building. After observing Zoletta leave the building with a suspicious package and drive away with Abaia, the officers trailed and then stopped their car. The package contained approximately 200 grams of methamphetamine. Zoletta independently confirmed that he dealt drugs for Del Rosario for two years in New York and New Jersey, that he had received these drugs from Del Rosario, and that he was to deliver them on Del Rosario's behalf. Zoletta also confirmed the apartment number and that additional people remained in the apartment. This information was sufficient to establish probable cause to seek a search warrant for the apartment irrespective and independent of those items discovered within the apartment in connection with the tainted police entry. With this independent support, a valid search warrant issued, the fruit of that search was not tainted, and thus there was no violation of Appellants' Fourth Amendment rights.

IV. Expert Testimony

Alcantera claims that the District Court overstepped Federal Rule of Evidence 702 by permitting the Government's expert witness, Ronald Dixon ("Dixon"), to testify about facts purported to be within the common knowledge of the jurors. Alcantera did not object to the District Court's finding that Dixon was qualified to testify as an expert in the area of drug-trafficking practices and techniques. Instead, he objected on the ground that there was no need for the testimony and that it was unfairly prejudicial. We review for abuse of discretion the District Court's ruling as to the qualifications of Dixon and the reliability of his testimony. In re Paoli R.R. Yard P.C.B. Litig., 35 F.3d 717, 749 (3d Cir. 1993). We also review for

abuse of discretion the Court's refusal to exclude the evidence under Federal Rule of Evidence 403 because any unfairly prejudicial effect did not substantially outweigh its probative value. United States v. Mathis, 264 F.3d 321, 326–27 (3d Cir. 2001).

In a landmark ruling that led in December 2000 to the amendment of Rule 702 of the Federal Rules of Evidence, the Supreme Court in Daubert v. Merrell Dow Pharamaceuticals, Inc., 509 U.S. 579 (1993), established the trial court as a gatekeeper to exclude unreliable expert testimony. Prior to December 2000, Rule 702 read:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702 (2000). The Rule as amended reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2001).

In both versions, the purpose of expert testimony is to assist the trier of facts to understand, evaluate, and decide complex evidential material. United States v. R. J. Reynolds Tobacco Co., 416 F. Supp. 313 (D.N.J. 1976)."The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact." Fed. R. Evid. 704, advisory committee's note.

Although this Court has not specifically declared the modus operandi of drug trafficking as an appropriate or reliable field for expert opinion, several courts of appeal

33

have consistently admitted such testimony. See United
States v. Gil, 58 F.3d 1414, 1421-22 (9th Cir. 1995) (ruling
expert testimony regarding how drug-traffickers employ
telephone pagers and public telephones to avoid detection
by police was properly admitted); United States v. Tapia-
Ortiz, 23 F.3d 738, 741 (2d Cir. 1994) (affirming the
admission of expert testimony of how drug traffickers
employed telephone pagers "in order to avoid detection");
see also United States v. Gastiaburo, 16 F.3d 582, 589 (4th
Cir. 1994) (ruling that expert testimony about "tools of the
trade" of drug traffickers, including "beepers," was properly
admitted); United States v. Solis, 923 F.2d 548, 549-51 (7th
Cir. 1991) (concluding that expert testimony that the use of
"beepers' by drug traffickers permit them to be anonymous
and mobile was properly admitted). We join those courts.

Dixon, the Lieutenant of Detectives for the Middlesex
County, New Jersey Prosecutor's Office, and a thirty-two
year law enforcement veteran, testified that cellular
telephones can be used by drug traffickers to frustrate
police investigations. He explained that police who intercept
a cellular call will often be ignorant of the location of the
caller. The police are unable to engage in simultaneous
wire-tapping and surveillance of the caller, a useful
investigative technique that often leads police to the
location of a drug delivery. Dixon also testified that drug
traffickers employ telephone pagers to transmit numeric
coded messages. He explained that even if police are able to
intercept the coded message, they will likely be unable to
decode it.

We conclude that Dixon's testimony meets the "helpful to
the trier of fact" threshold established in Rule 702. It is not
common knowledge among lay persons serving as jurors
that police are unable simultaneously to wire-tap cellular
phone calls and keep under surveillance those who make
them, or that numeric pagers are used by drug traffickers
to transmit coded messages. Since this testimony was
helpful and relevant, we likewise conclude that the District
Court acted within its discretion in refusing to exclude it
under Rule 403. Therefore, the District Court in this case
properly exercised its discretion to admit Dixon's testimony
with respect to drug traffickers' use of cell phones and
pagers to evade location by police investigators.

V. Sufficiency of Evidence of a Single Conspiracy

Appellants Alcantera and Batoon contend that the
evidence was insufficient to sustain their convictions of
conspiring to distribute methamphetamine. First, they
argue that the proofs at trial do not support the jury's
verdict as to each of them. Second, they contend that the
Government failed to prove that they were members of a
single conspiracy as charged in the indictment. We review
the sufficiency of the evidence in the light most favorable to
the Government, and credit all reasonable inferences that
support the verdicts. See Glasser v. United States, 315 U.S.
60, 80 (1942); Riddick, 156 F.3d at 508. The verdict will be
sustained if "any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt."
United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996).

The essential elements of conspiracy are "(1) a shared
`unity of purpose,' (2) an intent to achieve a common goal,
and (3) an agreement to work together toward the goal."
United States v. Mastrangelo, 172 F.3d 288, 292 (3d Cir.
1999) (citing United States v. Wexler, 838 F.2d 88, 90-91
(3d Cir. 1988)). "This proof incorporates a demonstration
that a defendant has `knowledge of the illegal objective
contemplated by the conspiracy'." Id. (citing Wexler, 838
F.2d at 91). "The elements of a conspiracy may be proven
entirely by circumstantial evidence, but each element of the
offense must be proven beyond a reasonable doubt."
Wexler, 838 F.2d at 90; see also United States v. Kapp, 781
F.2d 1008, 1010 (3d Cir.), cert. denied, 475 U.S. 1024
(1986); United States v. Samuels, 741 F.2d 570, 573 (3d
Cir. 1984).

A. Sufficiency of the Evidence of Conspiracy

Alcantera and Batoon argue that the evidence does not
support their role as co-conspirators. They contend that
neither had the requisite knowledge of the illegal objective
of the scheme to distribute methamphetamine such that
they could form an intent or agreement to join the
conspiracy. Moreover, they posit that uncorroborated co-
conspirator testimony is insufficient to support a
conspiracy conviction. Instead, Batoon insists that he was
merely in a buyer-seller relationship with Del Rosario that

35

did not rise to the level of a co-conspirator, while Alcantera claims that he was at Del Rosario's apartment to receive a gift for his newborn son and had no knowledge of the presence of illegal drugs.

The Government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants. See United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir. 1989), overruled on other grounds by United States v. Price, 13 F.3d 711, 727 (3d Cir. 1994). However, the Government must proffer sufficient evidence from which a jury could conclude that the drug transaction in which Appellants were involved was "a step in achieving the conspiracy's common goal of distributing cocaine for profit." Theodoropoulos, 866 F.2d at 593. As Appellants point out, "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." United States v. Gibbs, 190 F.3d 188, 198 (3d Cir. 1999) (citing United States v. McGlory, 968 F.2d 309, 324-25 (3d Cir. 1992), cert. denied, 507 U.S. 962 (1993)); see also United States v. Kozinski, 16 F.3d 795, 808 (7th Cir. 1994). However, in Price and Theodoropoulos we reasoned that "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." Price, 13 F.3d at 728; Theodoropoulos, 866 F.2d at 594.

Among the factors the Court considers to determine a defendant's knowledge of the conspiracy are: (1) the length of affiliation between the defendant and the conspiracy; (2) whether there is an established method of payment; (3) the extent to which transactions are standardized; and (4) whether there is a demonstrated level of mutual trust. Gibbs, 190 F.3d at 199 (citing United States v. Hach, 162 F.3d 937, 943 (7th Cir. 1998), cert. denied, 526 U.S. 1103 (1999)).

> While these factors are not necessarily dispositive of the issue, their presence suggests that a defendant has full knowledge of, if not a stake in, a conspiracy: when a defendant drug buyer has repeated, familiar dealings

36

> with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he is dealing, is more likely to depend heavily on the conspiracy as the sole source of his drugs, and is more likely to perform drug-related acts for conspiracy members in an effort to maintain his connection to them.

Gibbs, 190 F.3d at 199.

Alcantera and Batoon cite to the Tenth Circuit case of United States v. Evans, 970 F.2d 663 (1992), to support their argument that "[m]ere knowledge of an illegal activity, even in conjunction with participation in a small part of the conspiracy, does not by itself establish that a person has joined in the grand conspiracy." Id. at 670. What is needed is "a general awareness of both the scope and the objective of the enterprise to be regarded as a co-conspirator." Id.

Most damaging to this argument is that seven of the eight indicted defendants, including Alcantera and Batoon, were present in Del Rosario's apartment on February 25, 1999, when the N.Y.P.D. officers entered the apartment, with nearly 100 grams of crystal methamphetamine in plain view. Both were present in the apartment while the methamphetamine was distributed to other persons to be delivered or sold, and both arguably were providing "security" to Del Rosario. Alcantera knew of the plan to have Perez smuggle methamphetamine into the United States after he met with Daluro, and Batoon met with Perez the night she returned from her trip to the Philippines.

Contrary to the claim that he was merely in a buyer-seller arrangement with Del Rosario, Alcantera admitted to Uy that he was one of Del Rosario's methamphetamine distributors. Prior to the arrest, Alcantera obtained twenty grams of methamphetamine from Daluro in New Jersey expressly for delivery to Del Rosario. Moreover, after Alcantera testified that he never called Del Rosario on the telephone, the Government confronted him with telephone records that established that he made and received numerous phone calls to and from Del Rosario around the time that the shipment of methamphetamine was due in from the Philippines. Like Alcantera, Batoon received

37

distribution amounts of methamphetamine from Del Rosario several times, once on credit. This evidence is sufficient to prove their general awareness of the scope and objective of the conspiracy.

Alcantera and Batoon also argue that the uncorroborated testimony of their alleged co-conspirators Almiranez, Daluro, Zoletta and Uy is not sufficient to sustain their convictions, citing to United States v. Sturman , 49 F.3d 1275 (7th Cir. 1995). However, the Sturman Court left "open the question of whether co-conspirator testimony alone can support a conspiracy conviction." Id. at 1281 (citing United States v. Martinez de Ortiz, 907 F.2d 629, 632 (7th Cir. 1990) (en banc), cert. denied , 498 U.S. 1029 (1991)). The Seventh Circuit followed Sturman  with its opinion in United States v. Henderson, 58 F.3d 1145 (7th Cir. 1995), wherein it held that "[w]e will uphold a conviction based solely on the uncorroborated testimony of an accomplice unless his testimony is incredible as a matter of law." Id. at 1148–49.

In the context of accomplice testimony, we rejected in United States v. DeLarosa, 450 F.2d 1057 (3d Cir. 1971), the very argument Alcantera and Batoon proffer."We follow the Supreme Court in holding that uncorroborated accomplice testimony may constitutionally provide the exclusive basis for a criminal conviction." Id. at 1060 (citing Caminetti v. United States, 242 U.S. 470 (1917)). See also Jacobs v. Redman, 616 F.2d 1251, 1255 (3d Cir. 1980). This is particularly the case where the defense has ample opportunity to cross-examine the Government's witnesses, as Alcantera and Batoon had. See United States v. Enriquez, 201 F.3d 1072, 1074 (8th Cir. 2000) ("[Defense] counsel cross-examined each of the co-conspirators with whom the government had made plea agreements . . . and attempted to expose their potential for bias and self-interest. Furthermore, the jury was specifically instructed as to its role in weighing witnesses' testimony and credibility. The jury's decision to credit the testimony of those witnesses was within its province, and we will uphold the conviction if substantial evidence supports it.").

Viewing the evidence in the light most favorable to the Government, we conclude that a reasonable jury could have

38

found Alcantera and Batoon guilty of conspiracy to possess with intent to distribute methamphetamine. Alcantera's and Batoon's presence at the ringleader's apartment when the drug shipment was being doled out, their awareness of and involvement with Del Rosario and Perez around the time of the delivery, as well as repeated dealings with Del Rosario prior to the arrest, are sufficient facts from which a reasonable jury can infer a general awareness of the scope of the illegal objective. That some of this evidence was provided by alleged co-conspirator testimony does not render the entire evidence insufficient to support the convictions of Alcantera and Batoon. The Government's evidence addresses each of the factors discussed in Gibbs, establishing Alcantera's and Batoon's knowledge of the broader conspiracy and contradicting a mere buyer-seller arrangement.17

B. Variance between single conspiracy as charged and
        the proof at trial

Alcantera and Batoon also claim that the single conspiracy charged in the indictment impermissibly varied from the evidence at trial which proved, at most, that two separate conspiracies existed. "A defendant alleging a variance between a single conspiracy charged in an indictment and the proof presented at trial must demonstrate, first, that there was such a variance and, second, that the variance prejudiced one of his substantial rights." United States v. Quintero, 38 F.3d 1317, 1337 (3d Cir. 1994) (citing United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989)). "Where a single conspiracy is alleged in the

_____

17. The concern of the Tenth Circuit in Evans , echoed by Chief Judge Becker in footnote 3 in Gibbs -- that a small time drug dealer could be held responsible for all of the drugs originated by the cartel for sentencing purposes -- is not implicated in this case. We conclude that Alcantera and Batoon had sufficient knowledge of and a stake in the larger conspiracy to justify a jury finding them to be co-conspirators. See
Gibbs, 190 F.3d at 199 n.3; Evans, 970 F.2d at 670. Moreover, we note that the District Court in this case instructed the jury that "[a] buyer-seller relationship alone is insufficient to prove a conspiracy to distribute
or a conspiracy to possess with intent to distribute an illegal drug. This is the case even when the buyer intends to resell the purchased narcotics."

indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies." Kelly, 892 F.2d at 258 (citing United States v. Smith, 789 F.2d 196, 200 (3d Cir.), cert. denied, 479 U.S. 1017 (1986)). The issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury. United States v. Curran, 20 F.3d 560, 572 (3d Cir. 1994) (citing Smith, 789 F.2d at 200). We will sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support a finding of a single conspiracy. Smith, 789 F.2d at 200.

To provide notice of the charges against a defendant and to protect against double jeopardy, the indictment must adequately set forth the crime alleged. See Gaither v. United States, 413 F.2d 1061, 1071 (D.C. Cir. 1969). Where evidence at trial proves facts different than those alleged in the indictment, an impermissible variance may exist. Smith, 789 F.2d at 200. For example, when a single conspiracy is charged in the indictment and the evidence at trial proves only the existence of multiple, unrelated conspiracies, there is a variance. See Kotteakos v. United States , 328 U.S. 750 (1946); Kelly, 892 F.2d at 258; United States v. Boyd, 595 F.2d 120, 123 (3d Cir. 1978).

Multiple conspiracies are "separate networks operating independently of each other." United States v. Barr, 963 F.2d 641, 648 (3d Cir. 1992). "However, a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance." Smith, 789 F.2d at 200. Thus, the relatedness of the activities of the co-conspirators in support of the overall illegal scheme can defeat a claim of multiple conspiracies.

Variances "are examined on a case-by-case basis and constitute reversible error only if the defendant was prejudiced." Smith, 789 F.2d at 200 (citing United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985)); United States v. Somers, 496 F.2d 723, 743 (3d Cir.), cert. denied, 419 U.S. 832 (1974)). This "variance doctrine" protects a defendant from being tried "en masse for the conglomeration of distinct and separate offenses committed by others." United States v. Salmon, 944 F.2d 1106, 1116

(3d Cir. 1991), cert. denied, 502 U.S. 1110 (1992) (quoting Kelly, 892 F.2d at 258). "The doctrine is intended to prevent a situation in which the jury might `be unable to separate offenders and offenses and easily could ... transfer[ ] the guilt from one alleged co-schemer to another.' " Barr, 963 F.2d at 648 (quoting United States v. Camiel, 689 F.2d 31, 38 (3d Cir. 1982)).

Several courts have focused on the interdependency of the sub-schemes in support of the overall conspiracy. See, e.g., Evans, 970 F.2d at 670 ("the defendant's actions must `facilitate the endeavors of other alleged co-conspirators or facilitate the venture as a whole' ") (citing United States v. Horn, 946 F.2d 738, 743 (10th Cir. 1991)); United States v. Sophie, 900 F.2d 1064, 1080 (7th Cir.), cert. denied, 498 U.S. 843 (1990); United States v. Kenny, 462 F.2d 1205, 1217 (3d Cir.), cert. denied, 409 U.S. 914 (1972). Interdependency, however, is merely "evidence of an agreement." United States v. Taylor, 562 F.2d 1345, 1352 (2d Cir.), cert. denied, 432 U.S. 909 (1977). It is not an element of the offense. United States v. DiPasquale, 740 F.2d 1282, 1291 (3d Cir. 1984) (citing United States v. Shoup, 608 F.2d 950, 957 n.12 (3d Cir. 1979)).

In support of their argument, Alcantera and Batoon cite to a snippet from the uncorroborated co-conspirator testimony of Almiranez.

> Q.: (Direct examination of Almiranez by Government) When individuals came over to [Del Rosario's] apartment, what happened?
>
> A.: Oh, they get their drugs too. Everybody that went there, they get their own drugs.
>
> * * * *
>
> Q.: Were there any discussions in [Del Rosario's] apartment between you and the other individuals in the apartment regarding the distribution of crystal meth?
>
> A.: No, we don't -- we don't discuss those distribution . . . we don't discuss distribution, none.
>
> Q.: Why not, why don't you discuss it?

> A.: Because they distribute in New York. I do in
> Jersey. It's different areas.

This testimony, Alcantera and Batoon contend, disproves their knowledge of and interdependency with the"New Jersey" conspiracy. Consequently, they argue, the Government's allegation and the jury's finding that the two were part of single conspiracy must fail.

We disagree. "To establish a single conspiracy, the prosecutor need not prove that each defendant knew all the details, goals or other participants." United States v. Padilla, 982 F.2d 110 (3d Cir. 1992). "The prosecution must, however, demonstrate that a defendant, charging variance, knew that he was part of a larger drug operation." Quintero, 38 F.3d at 1337 (citing Padilla , 982 F.2d at 114). As we noted above in Part V.A., the Government met this burden of proof.

Moreover, we find that there is sufficient evidence from which a reasonable jury can find interdependency among the co-conspirators. The Government demonstrated that methamphetamine is difficult to prepare, find, and purchase on the streets. Alcantera and Batoon depended on a scheme involving Del Rosario, Perez and the shipment from the Philippines to possess and distribute the illegal drug. In turn, Del Rosario depended on the two to distribute the methamphetamine once it came in. In addition, because Alcantera and Batoon stayed with Del Rosario throughout the morning and afternoon of the arrest, the jury could have logically concluded that the two provided security to Del Rosario as the drugs were distributed. See United States v. Reyes, 930 F.2d 310, 312–13 (3d Cir. 1991) (finding a single conspiracy to be proven when there is "evidence of a large general scheme, and of aid given by some conspirators to others in aid of that scheme") (citing Kenny, 462 F.2d at 1216).

The concern with a "spillover of evidence" is unfounded in this case. The Government presented evidence that directly implicated both Alcantera and Batoon in the conspiracy. The majority of the remaining evidence, including the testimony of Zoletta about his own and Perez's role in the conspiracy, was relevant to both Alcantera and Batoon

42

regardless whether there was a single or multiple conspiracies.

Moreover, the District Court's jury instructions in this case dispel the concerns of prejudice to Alcantera and Batoon. With respect to the finding of a single conspiracy, the Court instructed the jury to acquit if the evidence established "separate or independent conspiracies[that] would be at variance with that charged," and that"proof of a different conspiracy, that is, one without that specific objective [alleged in the indictment], would not be proof of the conspiracy charged in the indictment and would require a verdict of not guilty." With respect to individualized findings of innocence or guilt, the District Court instructed the jury to give "separate consideration to and render a separate verdict as to each defendant based solely on the evidence pertaining to that defendant," and to"exercise great care to evaluate the evidence or lack of evidence against each defendant individually . . . without regard as to what your decision as to any other defendant might be."

In sum, we find that Alcantera and Batoon have failed to demonstrate (1) a variance between the single conspiracy as charged in the indictment and the evidence offered at trial to prove that conspiracy and, (2) regardless of the alleged variance, any prejudice to them as a result of the Government's proof at trial.

VI. Refusal to Immunize Del Rosario and Brady
Violation

Appellants Perez and Batoon claim that the District Court erroneously refused to immunize Del Rosario so that he could testify as a defense witness at trial. Based on the same set of facts, Perez and Batoon also claim that the Government failed to reveal exculpatory evidence to the defense with respect to Del Rosario's statements to investigators, thereby warranting a new trial. We review the District Court's refusal to immunize Del Rosario for abuse of discretion. United States v. Herman, 589 F.2d 1191, 1213–14 (3d Cir. 1978). The District Court's factual findings regarding the likely effect of undisclosed information are reviewed only for clear error. United States v. Pelullo, 173 F.3d 131, 135 (3d Cir. 1999).

43

Immediately following his arrest and after waiving his Miranda rights, Del Rosario told investigators that Perez had smuggled multiple kilograms of methamphetamine into the United States from the Philippines and delivered them to Del Rosario. Months later, Del Rosario changed his story and told investigators that Zoletta, not Perez, had delivered the drugs to Del Rosario. Perez sought to present Del Rosario as a defense witness and question him about the second statement. The District Court had Del Rosario and his attorney appear before it to determine if he would testify. Del Rosario, outside the presence of the jury, asserted his Fifth Amendment privilege against self-incrimination and refused to answer any questions. Perez then asked the District Court to confer immunity on Del Rosario so that he could be compelled to testify as a defense witness, in the hope that he would testify in accordance with his second statement and exculpate Perez. The Government opposed the request.

We have prescribed a five-factor analysis when assessing a request to grant judicial use immunity[18] to a witness who refuses to testify: (1) the immunity is properly sought in the District Court; (2) the witness is available to testify; (3) the proffered testimony is clearly exculpatory; (4) the proffered testimony is essential to the defense; and (5) there is no strong governmental interest against the immunity. See United States v. Cohen, 171 F.3d 796, 802 (3d Cir. 1999); Government of Virgin Islands v. Smith, 615 F.2d 964 (3d Cir. 1980). The District Court concluded that, because any exculpatory testimony that Del Rosario might offer on behalf of Perez would be severely impeached by his prior inculpatory statement against her, Perez could not establish that the proffered testimony was "clearly exculpatory" or "essential to her defense."

A similar analysis applies to the alleged Brady violation. Under Brady v. Maryland, 373 U.S. 83 (1963), the

_____

18. Use immunity, conferred by the judge on a witness who refuses to testify, prohibits a witness' compelled testimony and its fruits from being
used in any manner in connection with the criminal prosecution of the witness except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. See 18 U.S.C. SS 6001-6005.

suppression by the prosecution of evidence favorable to an accused warrants a new trial where "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Evidence is material if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. Stickler v. Greene , 527 U.S. 263, 281 (1999); see also Holman v. Wilson, 158 F.3d 177, 181 (3d Cir. 1998) (evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"); United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991) (evidence is favorable if "it may make a difference between conviction and acquittal").

Perez and Batoon argued below that the prosecution violated Brady by failing to disclose a statement by Del Rosario that Zoletta, not Perez, had delivered the drugs to Del Rosario. The District Court concluded that the Government had violated a duty under Brady to disclose the identity of Zoletta as a potential alternative source for the drugs to the defense for two reasons: first, because the evidence was "substantially exculpatory," and second, because it was untimely offered after the immunity hearing. However, the District Court concluded that a new trial was not warranted because there was no reasonable probability that the result of the proceeding would have been different if Del Rosario's statement had been disclosed.19 In other words, the allegedly exculpatory evidence was neither "essential to the defense" under the immunity test nor "material" under the Brady test.

On appeal, Perez and Batoon offer a litany of reasons why the District Court should have granted a new trial. First, Perez argues that the suppressed evidence was

_____

19. Here, the District Court slightly misstated the law because "strictly speaking, there is never a real `Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Stickler, 527 U.S. at 281. The Government does not violate Brady unless the undisclosed evidence is found to be material. Because the District Court ruled that the evidence was not material to Perez's defense, no Brady violation occurred.

material because the defense was prevented from using Del Rosario's statement to contradict the prosecution's theory of the case. She contends that Del Rosario's statement that Zoletta had delivered drugs to his apartment on the night before the raid would have been credible because (1) it was corroborated by Zoletta's own admission before the jury, and (2) he had nothing to gain by contradicting the prosecution's theory of the case at a time when he had hopes for entering into a cooperating plea agreement. However, the District Court addressed this argument and concluded that Del Rosario's testimony, even if credible, would not have made a difference in the trial because, while it may come in to impeach Zoletta, it could not come in for substantive consideration by the jury because it was inadmissible hearsay -- an out-of-court statement by Zoletta offered by Perez to prove the truth of the matter asserted.

This position is supported in cases cited by the Government. See Bradley v. Nagle, 212 F.3d 559, 567 (11th Cir. 2000) (finding undisclosed evidence was not material where "[e]ach item of evidence was in fact inadmissible at trial" and the defendant "presents only speculation that he would have uncovered any admissible evidence from these three hearsay leads"); United States v. Derrick, 163 F.3d 799, 818 (4th Cir. 1998) (concluding that undisclosed statements by legislators to FBI agents were not material in prosecution of legislators for campaign finance violations in part because they were inadmissible hearsay); see also Wood v. Bartholomew, 516 U.S. 1, 5 (1995) (per curiam) (finding failure to disclose that witness had failed polygraph test did not deprive respondent of material evidence because polygraph results would have been inadmissible at trial, even for impeachment purposes).

The Government responds that the value of Del Rosario's later statement inculpating Zoletta (and thereby exculpating Perez) would have been undercut by the fact that Del Rosario's initial statement regarding Perez was fully and powerfully corroborated by Perez's passport and travel itinerary as well as the testimony of Uy and Almiranez. Del Rosario's statement is therefore neither essential to Perez's defense nor material evidence warranting a new trial. We

46

agree. See United States v. Messerlian, 832 F.2d 778, 795 (3d Cir. 1987) (finding no Brady violation for failure to disclose exculpatory evidence that was not credible); see also Buehl v. Vaughn, 166 F.3d 163, 181 (3d Cir. 1999) (holding undisclosed statement that someone other than the defendant possessed the murder weapon three weeks after the murder was not material exculpatory evidence "[i]n light of this overwhelming evidence that Buehl had the [murder weapon] at the time of the killings and that he was the murderer"); Landano v. Rafferty, 856 F.2d 569, 572 (3d Cir. 1988) (concluding that evidence tending to exculpate defendant, Landano, in robbery and murder was not material because "any such inference would have been directly at odds with other, stronger evidence implicating Landano in the crime").

Perez and Batoon also argue that the suppressed evidence was material because the defense was prevented from cross-examining Zoletta more vigorously to develop further evidence exculpating Perez. The District Court concluded that heightened cross-examination of Zoletta that might have occurred if the defense had known of Del Rosario's statement would not have induced Zoletta to admit before the jury that he had been the one to deliver the drugs to Del Rosario's apartment.

Perez and Batoon further argue that the suppressed evidence was material because it might have persuaded the District Court to grant Del Rosario immunity so that he could testify for the defense at trial. The District Court, reconsidering its denial of immunity for Zoletta on defendants' motions for a new trial, conceded that "had the identity of Mr. Zoletta as a potential specific alternative source of the drugs been revealed prior to that immunity hearing his name would certainly have been mentioned and the court would have been asked to evaluate [Del Rosario's] immunity request in that light." However, the District Court ultimately concluded that its ruling on use immunity would not have changed even if the Government had properly disclosed Del Rosario's statement implicating Zoletta rather than Perez. The Court explained that Del Rosario's statement would not have been "clearly exculpatory testimony" warranting a grant of immunity because its

47

value would have been undercut by Del Rosario's prior inconsistent statement implicating Perez.

In this light, the District Court properly came to the conclusion that a retrial was not warranted because there was no reasonable probability that the suppressed evidence would have changed the outcome of the original proceeding. The District Court was best situated to observe Zoletta's demeanor and attitude at trial. See Messerlian , 832 F.2d at 795 (concluding that, when considering whether witness's testimony is exculpatory evidence for purposes of possible Brady violation, the District Court "was best situated to observe the demeanor of the two witnesses and to assess the consistency of their testimony").

In addition, we find no merit to Perez and Batoon's arguments that they were prejudiced at sentencing by the suppressed statement. It had been disclosed by the time of sentencing, and the defense lawyer conceded at the sentencing hearing that he "did not have grounds to dispute" the Probation Office's calculation of the applicable drug amount based upon the defendants' participation in the conspiracy.

With respect to Del Rosario's testimony, we conclude that the District Court did not abuse its discretion when it declined to immunize Del Rosario. In light of the evidence, we find reasonable the District Court's determination that the disclosure of Del Rosario's statement implicating Zoletta would not have changed the decision to deny Del Rosario use immunity. See United States v. Steele, 685 F.2d 793 808 (3d Cir. 1982) (judicial immunity properly denied where proposed immunized testimony would not have been "clearly exculpatory"); United States v. Lowell, 649 F.2d 950, 965 (3d Cir. 1981) (same); see also United States v. Ammar, 714 F.2d 238, 251 n.8 (3d Cir. 1983) (judicial immunity properly denied where "the exculpatory nature of [the] testimony is at best speculative").

VII. Sentencing

Finally, Alcantera's and Batoon's challenge of their sentences--specifically that the District Court erred (1) in denying a two level minor role reduction pursuant to the

48

U.S. Sentencing Guidelines Manual S 3B1.2 20 and (2) in attributing more than between one and three kilograms of methamphetamine to Batoon--is without merit. Nor does Alcantera's sentence violate Apprendi v. New Jersey, 530 U.S. 466 (2000).

A. Minor Role Reduction

In United States v. Haut, 107 F.3d 213, 218 (3d Cir. 1997), we held that we must sustain the District Court's factual findings as to a S 3B1.2 minimal or minor role adjustment unless those findings are clearly erroneous. See id. ("We review under a clearly erroneous standard the district court's factual determinations, such as whether a defendant receives a reduced or increased offense level based on his role in the offense."); United States v. Carr, 25 F.3d 1194, 1207 (3d Cir. 1994); United States v. Bierley, 922 F.2d 1061, 1064 (3d Cir. 1990) (citing United States v. Mejia-Orosco, 867 F.2d 216, 220-21 (5th Cir. 1989) (holding that role in the offense is a factual determination, albeit complex; a district court's decision not to apply an adjustment based on such a determination is reversed only for clear error)). A decision is clearly erroneous if the reviewing court is left with the definite and firm conviction based on all the evidence that the trial court made a mistake. United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); Davis v. United States Steel Supply, No. 2571, 1981 WL 26711, at *6 (3d Cir. Sept. 24, 1981).

Here, we cannot say that the District Court committed clear error in finding that Alcantera and Batoon were not entitled to a minor role reduction. The District Court sentenced Alcantera to 190 months imprisonment. In doing

_____

20. Section 3B1.2 states:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

49

so, the Court denied his motion for a minor role downward departure of two points. It reasoned as follows:

> [T]he definition of a minor participant under Section 3B1.2 is any participant who is less culpable than most other participants, whose role could not be described as minimal. . . . [I]f we take a look at the others involved here, Batoon, Almiranez, Zoletta, Del Rosario, this Court is not in a position to say it has been established that Mr. Alcantera is to be considered less culpable than those other participants. . . . Their role, although different perhaps than Perez or Del Rosario, in this Court's view, was significantly important, certainly they are as culpable as each other in performing those similar functions without which the distribution and the conspiracy could not have succeeded. So that it's the Court's determination that Mr. Alcantera is not entitled to a minor role here .. .

With respect to Batoon, the District Court denied his motion for a minimal or minor role downward departure of three points, sentencing him to 152 months imprisonment. The Court stated:

> [N]ow to the question of . . . Section 3B1.2 .. . as to whether Mr. Batoon is entitled to a mitigating role. He asks the Court to consider even his role as minimal participant and then minor participant, someone entitled to a three level reduction if his conduct would be classified between those two roles. . . [F]or the purpose of Section 3B1.2, a minor participant means any participant less culpable than most other participants but whose role should not be discarded as minimal. . . . [T]his Court is not in a position to say that Mr. Batoon is a person who is less culpable than most other participants. . . . We have a number of people identified and the Court is not prepared to say that Mr. Batoon's role could be considered modest . . . . Mr. Batoon . . . [was] on the scene on the premises for at least a significant period of time on the day in question while couriers or purchasers, as the case may be, were coming and going for the purposes of receiving varying amounts of meth from Mr. Del Rosario. [T]he Court therefore finds . . . Mr. Batoon . . .

50

not so less culpable than any others as to be determined to be less culpable than most other participants . . . . So that, based on that determination as well, the Court declines to apply a minimal or even a minor role adjustment.

Based on the record before us, we conclude that the District Court's findings as to Alcantera's and Batoon's roles in the conspiracy were not clearly erroneous. The Court analyzed their respective participation against that of each co-defendant and found that each was no less culpable than any other, and therefore did not qualify for the departure.

B. Quantity Attributable to Batoon

Batoon also argues that the Government failed to prove that he was responsible for any of the drugs, let alone the one to three kilograms found by the District Court to be the quantity seized from Del Rosario's apartment. We review for clear error the District Court's findings of fact regarding the relevant quantities of drugs attributable to the defendant. United States v. Gibbs, 190 F.3d 188, 214 (3d Cir. 1999). Calculation of the applicable drug amount must be determined on the basis of Batoon's relevant conduct. See U.S. Sentencing Guidelines Manual SS 1B1.3, 2D1.1. Relevant conduct includes:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

51

Id. S 1B1.3(a)(1). The application notes help clarify the definition of relevant conduct. Application note 2 states in part:

> In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:
>
>  (i) in furtherance of the jointly undertaken criminal activity; and
>
>  (ii) reasonably foreseeable in connection with that criminal activity.
>
> . . .
>
> In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.
>
> . . .
>
> With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.

Id. S 1B1.3, cmt. n.2.

Batoon contends that he should not be responsible for the amount of drugs found in Del Rosario's apartment because he did not "agree[ ] to jointly undertake" in the drug distribution scheme. However, the District Court found Batoon responsible for the full amount of drugs pursuant to S1B1.3(a)(1)(A) because Batoon personally "aided and abetted" the distribution of methamphetamine by providing security to Del Rosario. Application note 2 explains that a finding of joint undertaking under subsection (a)(1)(B) is not necessary where the defendant

52

personally aids or abets a crime under (a)(1)(A). Id. S 1B1.3, cmt. n.2.

In response, Batoon replies that he did not "actually agree[ ] to provide such security," and thus, he should not be found responsible under this provision. However, Batoon's argument fails to recognize that the agreement can be explicit or an "implicit agreement fairly inferred from the conduct of the defendant and others." U.S. Sentencing Guidelines Manual S1B1.3, cmt. n.2. Here, from Batoon's conduct (specifically his remaining in Del Rosario's apartment for a significant amount of time while several others came and went), the District Court found an implied agreement between Del Rosario and Batoon to provide security.

> I believe it's also a fair inference for the Court to conclude that Mr. Del Rosario did not want to be alone or virtually alone in the apartment with supplies of methamphetamine of this kind while being vested with any number of persons who would be looking for drugs. . . . [T]he presence of confidants in Mr. Del Rosario, such as, Mr. Batoon, . . . certainly had the effect of providing some level of security to Mr. Del Rosario . . . .

Furthermore, Batoon can be found responsible for the full amount of drugs pursuant to S1B1.3(a)(1)(B) because the full amount of drugs present in the apartment and Batoon's conduct were "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." U.S. Sentencing Guidelines Manual S 1B1.3, cmt. n.2. Batoon's conduct was in furtherance of the jointly undertaken criminal activity because, as already noted and among other things, evidence exists that he provided security for Del Rosario while distributing the drugs. The full amount was reasonably foreseeable to Batoon because he was in the apartment for an extended period of time while the drugs were being distributed, and there was information circulating that a large shipment had arrived from the Philippines.

With the above in mind, it cannot be said that the District Court committed clear error in attributing the

53

entire amount of the drugs to Batoon as he "is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." Id.; see also Gibbs, 190 F.3d at 214-15 (holding that appellant who acted as enforcer was responsible at sentencing for all of the drugs distributed during the time he was an enforcer).

C. Apprendi

Although not claimed in the District Court, Alcantera, in a pro se addendum to his counseled brief, claims before us that the District Court erred by calculating the amount of methamphetamine attributable to him at sentencing by a preponderance of the evidence, rather than requiring the amount to be determined by a jury beyond a reasonable doubt. He argues that this violates Apprendi v. New Jersey, 530 U.S. 466 (2000). Because he did not raise this claim in the District Court, our Court reviews only for plain error. See United States v. Olano, 507 U.S. 725 (1993); United States v. Vazquez, 271 F.3d 93 (3d Cir. 2001) (en banc); United States v. Mack, 229 F.3d 226, 234-35 & n.12 (3d Cir. 2000); see also United States v. Swatzie , 228 F.3d 1278, 1281 (11th Cir. 2000).

The Supreme Court in Apprendi held that,"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. Here, the District Court's finding of the applicable drug amount did not increase the penalty for the crime beyond the statutory maximum. Alcantera was sentenced to 190 months, far less than the lowest statutory maximum for violations of 21 U.S.C. S 846, which is 20 years. See 21 U.S.C. SS 841(b)(1)(C), 846. Thus, there is no error, let alone plain error, under Apprendi. See United States v. Williams, 235 F.3d 858, 863 (3d Cir. 2000) (ruling that "Apprendi is not applicable to [appellant's] sentence, because the sentence actually imposed . . . was well under the original statutory maximum of 20 years."); In re Edmonds, No. 00-3075, 2000 WL 1683479, at *1 (D.C. Cir. Oct. 12 2000) (per curiam)

(concluding that because defendant did not exceed the
S 841(b)(1)(C) statutory maximum, Apprendi "is not
implicated").

VIII. Conclusion

For the reasons stated above, we affirm the convictions
and sentences of Appellants Perez, Alcantera and Batoon.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit