McKee, Chief Judge,
concurring in part and dissenting in part
Although I agree with the majority’s conclusion that there was sufficient evidence to convict Jamaal Mike of being in possession of a firearm, I write separately to clarify how courts should interpret the definition of “firearm” under 23 V.I.C. § 451. In addition, I can not agree that the district court properly denied use immunity because I believe that circumstantial evidence that does not directly contradict the testimony of a proposed defense witness is insufficient to negate the otherwise clearly exculpatory nature of such testimony. I therefore believe that the district court erred in not granting use immunity pursuant to our decision in Gov’t of Virgin Islands v. Smith, 615 F.2d 964, 972, 17 V.I. 623 (3d Cir. 1980)). Accordingly, I dissent from my colleagues’ use immunity analysis and thus can not concur in the judgment.
I. The Definition of a Firearm Under VI Law
The facts relevant to Mike’s receipt of a “firearm” were not disputed at trial: a ballistics expert testified that the gun that was mailed to Mike was operable when law enforcement agents intercepted it. An agent then removed the bolt from the gun, rendering it inoperable. The gun was then forwarded to Mike, and the bolt was mailed separately to another government official. It was not included in the package Mike received. Therefore, when Mike received the firearm, it was no longer “operable.”
Mike argues that because the firearm was inoperable when he received it, he cannot be charged with violating 14 V.I.C. § 2253(a)[1], which criminalizes unauthorized possession of a firearm. A firearm is defined under the Virgin Islands Code as follows:
*1363 (d) “Firearm” means any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition, including any air gas or spring gun or any “BB” pistols or “BB” guns that have been adapted or modified to discharge projectiles as a firearm.
23 V.I.C. § 451 (emphasis added).
Mike refies on two cases to argue that a firearm must be operable under 23 V.I.C. § 451(d) to sustain a conviction for illegal possession of a firearm.[2] Neither is persuasive. In Virgin Islands v. Henry, 232 Fed. Appx. 170 (3d Cir. 2007) (unpublished), we simply noted in the procedural history that:
the Appellate Division [of the Virgin Islands] . . . agreed [with the petitioner] that the government had failed to offer evidence showing that one of the guns retrieved at the scene was operable (i.e., capable of discharging ammunition). Accordingly, the Court reversed Henry’s conviction with respect to the count involving the gun that was not shown to be operable and affirmed his conviction with respect to the remaining gun [which was shown to be operable.]
Id. at 173. However, in reaching our holding we did not determine whether a firearm must be operable in order to be a firearm under 23 V.I.C. § 451(d). In the second case, the District Court of the Virgin Islands held: “To prove this charge [possession of an unlicensed firearm], the government must show that the firearm was operable.” Virgin Islands v. Albert, 1980 U.S. Dist. LEXIS 14466, 18 V.I. 21 (D.Ct. V.I. 1980) (citing 14 V.I.C. § 2253(a) and 23 V.I.C.. § 451(d)). Neither case is analogous to the situation here where a firearm that was capable of discharging ammunition is subsequently ren *1364 dered inoperable by law enforcement officials and then forwarded to a defendant to take possession of it as part of a criminal investigation.[3]
I agree that the gun that Mike received qualifies as a “firearm,” but my analysis of that issue diverges a bit from that of my colleagues. The majority writes:
In his brief, Mike argues that his motion should have been granted because the testimony at trial showed that the AK-47 was delivered without its firing bolt and was therefore inoperable. However, at oral argument, Mike shifted tack, instead arguing that the problem was that there was no evidence at trial showing that the weapon had ever been test fired and shown to be capable of firing a bullet. The record demonstrates otherwise.
Maj. Op. at 18. My colleagues then conclude that because there was evidence that the firearm was operable when the government tested it, a rational jury could have concluded that the AK-47 was capable of discharging ammunition.
Although I agree with the majority’s conclusion, I do not think it is at all relevant that défense counsel “shifted tack” at oral argument. Although Mike’s attorney stated that there was no evidence regarding whether the weapon was ever “dry-fired” by the government, it appears that he was merely confused about the record. Mike’s counsel did not concede the issue in his brief.
Accordingly, I think we should take this opportunity to decide directly that the Virgin Islands statute applies to a weapon that is capable of firing when placed into the mail, but subsequently is rendered inoperable by law enforcement agents before sending it on its way to a defendant in order to make a controlled delivery. Addressing the issue more directly will eliminate any possibility that law enforcement agents may believe they have to place a “live” weapon into the mail in order to prove a violation of this and similar statutes.
To establish a violation of § 2253(a), the government must prove the following two elements beyond a reasonable doubt: (1) the defendant did *1365 possess, bear, transport or carry, “either, actually or constructively, openly or concealed” (2) “any firearm, as defined in Title 23, section 451(d) of this code, loaded or unloaded.” 23 V.I.C. § 451(d) defines a firearm as “any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition . . . .”
However, § 451(d) does not require that a firearm be “operable.” Instead, its plain language requires only that the device be “capable of discharging ammunition by means of gas generated from an explosive composition . . . .” 23 V.I.C. § 451(d) (emphasis added).
The word “capable” is not synonymous with the word “operable.” Merriam-Webster’s dictionary defines “capable” as “having traits conducive to or features permitting.” Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/capable (last visited June 21, 2011). The Oxford English Dictionary (“OED”) defines “capable” as “having room or capacity for.” Capable Definition, Oxford English Dictionary (Online Version), http://www.oed.com/view/Entry/27354 (last visited June 21, 2011).
The OED defines “operable” as “able to be operated.” Operable Definition, Oxford English Dictionary (Online Version), http://www.oed.com/view/Entry/131732 (last visited June 21, 2011). Thus, a firearm may be “capable” of discharging ammunition, but not “operable,” if it has the potential to fire ammunition, or the “capacity for” discharging ammunition, but cannot do so at the relevant time.
Here, the AK-47 was certainly capable of discharging ammunition, as the government’s evidence established. Although the AK-47 that Mike received lacked one part —■ the bolt — the firearm still had “features permitting” it to discharge ammunition, including a barrel, functioning trigger, piston, hammer, buttstock, grip and magazine. All of these were in perfect working order. Although a firearm that is missing a bolt may not be operable until the missing bolt is replaced, it nevertheless has the “capacity for” discharging ammunition.
More importantly, requiring such a firearm to be “operable” would violate the plain language of 23 V.I.C. § 451(d), which explicitly states that a gun need not be loaded in order to be considered a firearm. An unloaded firearm is “inoperable,” since it cannot discharge ammunition. Section 451(d)’s language, permitting a device to be considered a firearm even if it is unloaded, reflects an overwhelming legislative concern that *1366 the statute not be limited to firearms that could be fired at a given moment. Rather, the legislature was clearly concerned about the potential for firing ammunition and crafted the definition of “firearm” accordingly.
Interpreting the statute in this manner does not broaden 23 V.I.C. § 451(d) to include weapons that should not fairly be considered firearms. Neither a scope, nor even the missing bolt without the rest of the weapon, would constitute a firearm under § 451(d), because such parts and accessories do not have the capacity to fire ammunition. They may facilitate firing a weapon, but they are not capable of inflicting harm unless affixed to the actual firearm or integrated into it. Doing so is what allows the weapon to function as a “firearm;” and attaching such parts or accessories or integrating them into the weapon results in an altogether different “device” than such items standing alone.[4]
In sum, I believe that the government need only prove that the device Mike received was “capable of discharging ammunition.” in order to prove a violation of 14 V.I.C. § 2253(a). The testimony that agents were able to successfully “dry fire” the gun that Mike received was sufficient to prove that here. Removing the bolt rendered the AK-47 inoperable, but the weapon was still “capable” of firing ammunition. It was no less capable of that when Mike received it than if it had arrived unloaded but fully intact.
II. Use Immunity
Mike also appeals the district court’s refusal to grant use immunity to Fenyang Francis, who purportedly told his attorney that Mike did not know that there was a gun in the package he received. The majority finds that the district court did not abuse its discretion because Francis’s testimony is not “clearly exculpatory.” I disagree.
For testimony to be “clearly exculpatory,” it cannot be “undercut by ... prior inconsistent statement^],” United States v. Perez, 280 F.3d 318, 350 *1367 (3d. Cir 2002), or otherwise require a jury to make a credibility determination, United States v. Thomas, 357 F.3d 357, 365 (3d Cir. 2004).
The majority relies heavily on Thomas in affirming the district court’s denial of use immunity. There, we found that the district court properly denied use immunity to two witnesses whom Thomas wanted to call to present a theory that another person, James Stager, a car dealer, had planted drugs in his car. “[A]t least two other witnesses offered testimony that undercut Thomas’ theory that Stager planted drugs in his car.” Id. at 365.
The first witness was “Thomas’ girlfriend, Heather Barr, [who] testified that. . . Thomas told her that he already knew that drugs were in his car [and] that Thomas attempted to remove the drugs from his car in the police impoundment lot and fled to State College in order to avert being arrested when the police found the drugs.” Id. at 365-66. A second witness also undermined Thomas’s argument that Stager had the opportunity to plant the drugs in Thomas’s car because he testified that Thomas’s car was not where Thomas claimed it was in his theory of the case.
Since the testimony Thomas wanted to produce through immunized witnesses was in direct conflict with Thomas’s theory of the case, the jury would have had to decide whether to believe the witnesses whom Thomas wanted immunized, or two non-immunized prosecutorial witnesses. “Because a credibility determination would have been required in order to determine which parties were more credible, [the testimony Thomas sought to admit] would not have been ‘clearly exculpatory,’ as required under Smith.” Thomas, 357 F.3d at 366 (referencing Smith, 615 F.2d at 972).
Thomas is distinguishable. That case reinforces the unremarkable notion that use immunity not be used as a license to commit perjury. Here, the circumstantial evidence that the government presented that Mike knew the contents of the box does not clearly undercut Francis’s proffered testimony. In fact, Francis’s testimony could explain the circumstantial evidence the government admitted in its case-in-chief. Unlike the testimony in Thomas, Francis’s testimony here could have been accepted in a context that was completely compatible with evidence already admitted.
As part of its case, the government was required to prove that Mike knew that a gun was in the package he received. To prove this, the *1368 government presented two pieces of circumstantial evidence, which the majority cites as undermining the clearly exculpatory nature of Francis’s potential testimony. First, the majority cites the fact that, after they were arrested, Mike told Hunte that all he would get was “a haircut,” that is, go to juvenile detention. However, that only establishes that Mike knew some type of contraband was in the package, not that he knew it contained a gun. In theory, he could have believed he was receiving a shipment of drugs of some other kind of contraband. Therefore, Francis’s testimony could have been accepted without requiring the jury to chose between two competing statements if the jury believed Francis.
Next, the majority points to multiple telephone calls between Francis and Mike confirming that the two communicated numerous times in the weeks surrounding the firearm shipment and often in the minutes before and after the purchase of the firearm and the shipment of the firearm. However, we do not know the content of these calls. Without more, I do not believe we can assume enough about the substance of those conversations to justify denying use immunity. Although it is very easy to assume that Francis told Mike about the shipment of a firearm during at least one of those conversations, that should be an argument that is left for the jury to resolve after hearing all of the relevant evidence. In theory, Francis may have merely been confirming the receipt of contraband or the timing of the mailing of the package during those conversations.
We have found that the “clearly exculpatory”, standard for a use immunity analysis is “similar [to the] analysis [that] applies to [an] alleged Brady violation.” United States v. Perez, 280 F.3d 318, 348 (3d Cir. 2002). In Perez, we explained:
Under Brady[,] ... the suppression by the prosecution of evidence favorable to an accused warrants a new trial where “the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Evidence is material if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different.
Id. at 348-49 (citations omitted).
It is hard to imagine evidence with a greater exculpatory potential than the person who shipped the package saying that Mike did not know it contained a gun. Of course, the jury would have been free to disregard *1369 that testimony if it thought that the other evidence established beyond a reasonable doubt that Mike knew he was receiving a gun, or if it otherwise found Francis lacking in credibility. In Smith we said that “[i]mmunity will be denied if the proffered testimony... is found to relate only to the credibility of the government’s witnesses,” and in Ammar, we remarked that judicial immunity is improper when the proffered testimony is “at best speculative!.]?” Maj. Op. at 13 (citing Smith, 615 F.2d at 972, and United States v. Ammar, 714 F.2d 238, 251 n.8 (3d Cir. 1983)) (emphasis removed).
However, I do not believe our precedent can be interpreted to preclude use immunity for Francis merely because his credibility would have been in issue had he testified. Such a broad prohibition of use immunity would be tantamount to eliminating that tool altogether even when a witness’s testimony was required to satisfy the requirements of due process[5] because credibility is always an issue whenever any witness testifies. “Jurors are instructed ... in almost all cases, that they are to determine the credibility of all witnesses who testify . . . even in the absence of an affirmative challenge to witness credibility.” United States v. Universal Rehab. Servs. (PA), Inc., 205 F.3d 657, 666 (3d Cir. 200.0) (en banc). The mere fact that Francis’ credibility would have been aggressively attacked by the prosecutor should not be sufficient to undermine the due process interests of ensuring that a defendant is able to present a defense to a criminal charge. Here, the district court’s ruling deprived Mike of the only witness who could testify about Mike’s knowledge of the contents of the package he received.
The fact that such testimony would have made conviction more difficult if accepted by the jury is not a reason to deny a defendant access to favorable witnesses. Each of the protections of the accused that were so carefully engrafted onto the Bill of Rights makes conviction of the guilty more difficult. That surely cannot be a reason to so narrow the doctrine of use immunity that defendants are denied access to fact witnesses. The jury system rests upon the assumption that a properly instructed jury will be able to sort through the evidence and the arguments *1370 of counsel and determine if the government has proven its case beyond a reasonable doubt.
Judicial use immunity exists to ensure due process. Although a jury will always be free to disregard the testimony of a defense witness, courts should not usurp the jury’s function by deciding the credibility of a witness.
III. Affirmative Defense Under 23 V.l.C. § 470
Finally, before concluding, I think it helpful to state a concern and observation about the affirmative defense created by 23 V.l.C. § 470. As the majority notes, in United States v. McKie, 112 F.3d 626, 631, 36 V.I. 367 (3d Cir. 1997), we held that there is an affirmative defense to possessing a firearm under Virgin Islands law because a person had 24 hours to register the weapon before it becomes illegal to possess it. No doubt because of problems of proof, the Virgin Islands legislature amended § 470 to require “immediate” registration upon entering the Virgin Islands. However, as this case illustrates, that amendment creates more problems than it solves. It will often be impossible to rebut a claim of an intent to immediately register a firearm unless a defendant is given a sufficient opportunity to register it and fails to take any steps to do so upon entering the Virgin Islands.
In theory, the only way to disprove such a defense in the ordinary case would be for the government to establish a registration desk adjacent to the exit of the airport lobby with signs instructing all who arrived that they had to go directly to the registration desk and register any firearms. Experience with this statute has shown that police have a tendency to arrest a person with firearms as soon as he/she leaves the airport or takes possession of them rather than wait until circumstances are sufficient to refute any argument that the recipient intended to register the firearm.
Although that is perhaps understandable, the amended law creates real problems when an arrest occurs as soon as the recipient takes delivery of a weapon or leaves the airport building because there is no opportunity to immediately register the firearm. I agree that this complication does not assist Mike because all of the circumstances here supports the conclusion that he never intended to register the gun he received in the first place. Moreover, Mike’s attempt to seek shelter under § 470 is undermined by his attempt to also argue that he did not know what was in the package he received. I therefore join my colleagues in rejecting Mike’s defense here. *1371 However, the Virgin Islands legislature -may wish to consider the problems the amendment to this statute could create in future cases so that police will not have to wait a sufficient time to rebut any suggestion of an intent to immediately register a weapon before making an arrest for a violation of § 2253(a).[6]
Conclusion
In conclusion, I concur that sufficient evidence proves that Mike violated 14 V.I.C. § 2253(a). However, I believe that the court should have granted use immunity to Francis and thereby allowed Mike to present that defense testimony.

 The statute reads as follows:
(a) Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm, as defined in Title 23, section 451(d) of this code, loaded or unloaded, may be arrested without a warranty]
14 V.I.C. § 2253(a)

 The government does not dispute that § 451 (d) requires that a firearm be capable of firing ammunition. It counters, however, that the firearm was operable when it was mailed, and “but-for” its intervention, the firearm would have been operable when Mike received it. The government cites no cases in its favor, and a review of relevant case law finds no support for this proposition.

 Mike’s list of cases is not exhaustive. Although other cases similarly use the word “operable” and “capable of discharging ammunition” interchangeably, none of those cases are binding.

 Additionally, the more restrictive definition of “firearm” urged by Mike yields illogical results as evidenced here. This statute is clearly aimed at the illegal flow of guns and the carnage and devastation they cause. Mike’s interpretation of the statute would have required law enforcement officers who knew that a package contained an assault weapon to place that fully functioning weapon back into the stream of commerce in order to successfully complete an investigation while hoping that it would not be lost, delivered to the wrong party, or fall into the hands of minors or criminals along the way. It is inconceivable that any legislature would intentionally require such a result in enacting this kind of statute.

 See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (“The rights to confront and cross-examine witnesses and to call witnesses in one’s own behalf have long been recognized as essential to due process.”). See also Maj. Op. at 5-6 (discussing Chambers, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297).

 Judge Smith joins in these concerns and observations concerning the amendment to Section 470.