**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2996
_____

UNITED STATES OF AMERICA

v.

DWAYNE W. SHERMAN,
 Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 1:20-cr-00157-001)
District Judge: Honorable Jennifer P. Wilson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on October 31, 2024

Before: HARDIMAN, PHIPPS, and FREEMAN, *Circuit
Judges*

(Opinion filed: January 16, 2025)

Michael A. Consiglio
Carlo D. Marchioli
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102
                    *Counsel for Appellee*


Thomas A. Thornton
Frederick W. Ulrich
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101
                    *Counsel for Appellant*

_____

OPINION OF THE COURT
_____

**FREEMAN**, *Circuit Judge*.

A jury tried and convicted Dwayne Sherman of money laundering, conspiracy to commit money laundering, and conspiracy to distribute cocaine. He was sentenced to 262 months' imprisonment. In this appeal, he argues that the evidence was insufficient to sustain his convictions, the government's proof of the drug conspiracy at trial impermissibly varied from the charge in the indictment, and

2

the District Court erred at sentencing in finding that his drug offense involved possession of a dangerous weapon. For the following reasons, we will affirm the judgment.

# I

A grand jury returned an indictment charging Sherman with several offenses related to drug trafficking in Central Pennsylvania. The operative indictment charged him with six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B); one count of conspiracy to possess with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846; and one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). The drug-conspiracy charge arose from events alleged to have occurred in Pennsylvania, California, and elsewhere from on or about 2012 to May 2018.

At trial, the government presented evidence of Sherman's drug trafficking activities. Paul Alston, a drug dealer in Lancaster, testified that he met Sherman in early 2013 and started buying his weekly supply of cocaine from him. Sherman told Alston that he got his cocaine from California, and he sold one or two kilograms of cocaine to Alston each week starting in summer 2013. Sherman stopped selling to Alston in March 2014 when Sherman found a tracking device on his vehicle and feared that he was under investigation by law enforcement.

The government also presented evidence that Sherman dropped off large quantities of drug proceeds to individuals in Harrisburg on three occasions between October 2015 and January 2016. (The six money-laundering counts of the indictment corresponded to these three drops—two counts per

drop.) On each occasion, Sherman handed over cash ($277,000, $170,000, and $108,000, respectively) that was destined for Mexico. Sherman and the informants used coded language when discussing the money drops, and Sherman drove evasively and used other countersurveillance techniques when leaving the drops.

FBI informant Ruben Martin testified that he received the cash from Sherman during the first and third money drops.[1] Before each of those drops, Martin called Sherman and used the code phrase "on behalf of your brother" to arrange the meeting. App. 279, 452.

During the first drop, Sherman put two bags into the backseat of Martin's vehicle. Martin asked how many "titles" were in the bags, and Sherman replied that there were 277, which meant the bags contained $277,000. App. 314–15. Martin used the term "titles" because his cover for drug trafficking was a company that transported cars on car carriers. After Martin received the cash from Sherman, he turned it over to FBI agents, who counted and logged it before returning it to Martin. Back in his role as a co-conspirator, Martin arranged with contacts in Mexico to deliver the cash (minus a commission) to a courier in San Diego. The FBI surveilled that exchange and others as the money continued to change hands. Ultimately, the FBI recovered much of the money from a vehicle it stopped just before it crossed the border into Mexico. Agents recovered nearly $208,000 in sealed bags floating in the vehicle's gas tank.

---

[1] "Ruben Martin" is the pseudonym the witness was permitted to use at trial due to safety concerns.

The second and third money drops began in the same way: An FBI informant called Sherman to arrange a meeting, and FBI agents observed as the informant received bags of cash from Sherman in Harrisburg. The FBI then shepherded the cash and the informant to San Diego, where the informant passed the cash to someone else who drove the cash toward the Mexican border. Although the FBI surveilled the vehicles until just before they crossed the border, agents did not intercept the vehicles containing the cash from the second and third drops.

At trial, Martin testified that the drug proceeds from the money drops belonged to a Mexican drug trafficker named Carlos Beltran. In January 2016, after Sherman's second money drop, Martin traveled to Tijuana to meet with Beltran. They met at a *casa de cambio* (a currency exchange business) owned by a man who works as a broker for Beltran and other members of Mexican drug cartels. Beltran asked Martin to expand his role by carrying money and drugs to additional regions of the United States. Beltran said he had millions of dollars in New York and hundreds of thousands of dollars in the Harrisburg area. Because the money from Sherman's first drop got seized, Beltran said he wanted Martin to transport money in smaller quantities in the future to minimize the risk.

The two men met again at the same Tijuana *casa de cambio* in early April 2016. During that meeting, Beltran asked Martin to use his trucks to deliver 50 to 60 pounds of methamphetamine or heroin to Sherman in Harrisburg. Beltran explained that he could fly drugs from Mexico to Los Angeles and then to New York. During this conversation, Beltran referred to Sherman as his partner. He specified that Sherman would pay Martin for the drugs at the time of delivery and that Martin would keep a percentage of the money. This plan never materialized.

5

The jury also heard that Sherman was arrested for drug offenses in California later in April 2016. Police in Los Angeles County surveilled him as he purchased two kilograms of cocaine and about 15,000 pills from a DEA informant. They arrested him, and he admitted having the cocaine and pills in his car. (He thought the pills were oxycontin, but most of them turned out not to contain any controlled substance.) At trial in the instant case, the government did not connect the drugs Sherman bought in Los Angeles County to Beltran, but it presented evidence that Sherman crossed the United States-Mexico border four weeks before his Los Angeles County arrest. That was one of Sherman's fourteen United States-Mexico border-crossings between 2012 and 2018.

Finally, an IRS criminal investigator testified that he examined bank records for accounts held by Sherman and his wife. Sherman's account activity from 2014 through mid-2016 showed no indication of legitimate employment, such as payroll or paycheck deposits. However, it showed frequent cash deposits in amounts up to $6,500, totaling about $49,000 over that 28-month period. Sherman's wife's small business account activity reflected very few business expenses but numerous cash deposits of between $100 and $8,000. The cash deposits to that account totaled roughly $160,000 over a three-year period from 2014 to 2017.

The IRS investigator testified that banks are required to report any cash withdrawal or deposit of more than $10,000 to a Federal Crime Enforcement Network. Additionally, federal law requires any individual who transfers, sends, or carries more than $10,000 into or out of the United States to report that activity to federal agencies, which use the reports for law enforcement purposes. In the investigator's experience, drug traffickers know about those reporting requirements. When

6

United States currency is exchanged or handed over to another person at a *casa de cambio* in Mexico, those transactions are not reported to United States law enforcement agencies. Thus, those transactions are not subject to investigation.

After the government rested its case, Sherman testified in his own defense. He admitted that he sold cocaine in Lancaster between 2012 and 2014, and "maybe sometimes in [20]15." App. 439. He also admitted making the three money drops in 2015 and 2016, though he claimed he did not know the money was drug-related and made the drops at the request of his brother, who lived in Mexico. He also claimed not to know what his brother did for work. Sherman said he obtained the money from his brother's associate in Virginia, and he did not ask where the money came from because "if you start asking questions, then people start thinking you're telling and you're trying to set somebody up." App. 434. Nonetheless, he acknowledged knowing it was "[m]ost likely" that the money came from criminal activity, and when asked why he did not openly state the amount of cash when he had phone calls about the money drops, he explained that "the phones could be tapped, traced, whatever, so you just don't talk like that on the phones." App. 450.

Sherman admitted that on the date of his April 2016 arrest in California, he had purchased two kilograms of cocaine to resell to others. He also admitted that he drove to Mexico and California in his pickup truck, which was equipped with a hidden trap. He had the trap installed by someone in Mexico and used it to hide valuable items. Between January and May 2018, he crossed the United States-Mexico border an estimated twelve times.

Sherman testified that his wife kept a few handguns in their house during the periods when he stored the cash for the money drops in his home.  The guns were locked in a safe but accessible to him as a means of protecting his home.  He acknowledged that his wife and children could be in danger if people knew he was storing hundreds of thousands of dollars in the family's home, and he testified that he would do anything in his power to protect his family from danger.

The jury found Sherman guilty on all counts.  He filed a motion for a new trial, challenging the weight and the sufficiency of the evidence.  The District Court denied the motion but vacated Sherman's convictions for three of the substantive money-laundering counts.  It concluded that the pairs of money-laundering counts charged for each money drop were separate means of committing a single offense.

At sentencing, the District Court found that Sherman possessed a firearm in connection with a drug offense.  It relied on Sherman's trial testimony that handguns were present and accessible to him in his house when he was also storing large quantities of drug proceeds there.  Accordingly, over Sherman's objection, the Court applied the Sentencing Guidelines' dangerous-weapon enhancement.  U.S.S.G. § 2D1.1(b)(1).  It then calculated a Guidelines range of 262 to 327 months' imprisonment, and imposed a sentence of 262 months' imprisonment.  Sherman timely appealed.

**II**[2]

Sherman challenges the sufficiency of the evidence supporting each count of his conviction. Although we exercise plenary review of the sufficiency of the evidence at trial, "that plenary review is greatly tempered by giving substantial deference to the jury's finding of guilt." *United States v. Lacerda*, 958 F.3d 196, 225 (3d Cir. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). Accordingly, "[w]e review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (cleaned up).

**A**

To convict Sherman of money laundering under 18 U.S.C. § 1956(a)(2)(B)(i), the government had to prove that he "(1) attempted to transport funds from the United States to Mexico, (2) knew that these funds represented the proceeds of some form of unlawful activity, e.g., drug trafficking, and (3) knew that such transportation was designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the funds." *Regalado Cuellar v. United States*, 553 U.S. 550, 561 (2008) (cleaned up); 18 U.S.C. § 1956(a)(2)(B)(i). The third element "requires proof that the purpose—not merely effect—of the transportation was to

---

[2] The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

conceal or disguise a listed attribute" of the money. *Regalado Cuellar*, 553 U.S. at 567.

In *Regalado Cuellar*, the government obtained a conviction under § 1956(a)(2)(B)(i) by presenting evidence that the defendant hid drug-trafficking proceeds while transporting them from the United States to Mexico. *Id.* at 553–54 (recounting that law enforcement found $81,000 in cash in a secret compartment covered with animal hair under the rear floorboard of the defendant's vehicle, bundled in plastic bags and duct tape). At trial, the government also introduced testimony that transporting money secretly is consistent with drug smuggling. *Id.* at 567. But it "failed to introduce any evidence that that the *reason* drug smugglers move money to Mexico is to conceal or disguise a listed attribute of the funds." *Id.* (emphasis added). Absent evidence of purpose, the Supreme Court concluded that no reasonable jury could have found concealment or disguise was the purpose of the transportation. *Id.* at 568.

Sherman argues that his case is on all fours with *Regalado Cuellar* and his convictions for money laundering and the related conspiracy must be vacated. Not so. Sherman's trial record contains what was lacking at *Regalado Cuellar*'s trial: evidence of purpose to conceal the nature or source of the funds. In the light most favorable to the prosecution, the evidence shows that Sherman was a long-time drug trafficker in Central Pennsylvania. He sent over $500,000 of drug-trafficking proceeds to Mexico for his partner Beltran.[3] He did

---

[3] Despite Sherman's argument to the contrary, a reasonable jury could infer from the trial evidence that he knew the funds

so by making three money drops to people he did not know but who identified themselves using code phrases. He also used coded terms when discussing the money to thwart the law enforcement agencies that had reason to tap his phone. And he sought to evade law-enforcement surveillance when travelling to make the money drops. Sherman, like other drug traffickers, knew how to handle money without making a financial paper trail that would tip off law enforcement to his illegal activity. He was careful to make no bank transactions of more than $10,000 cash, and he sent large quantities of cash across the Mexican border secreted in traps or gas tanks. The cash was delivered to Beltran and converted to Mexican currency at a Mexican *casa de cambio* to further disguise the origin and nature of the funds. Based on this evidence, a reasonable jury could conclude that the purpose of transporting the money from the United States to Mexico was to conceal its nature or source.

Sherman also argues that the government did not prove he *knew* the illicit purpose of transporting the money from the United States to Mexico. He points to his trial testimony, where he admitted suspecting the money came from criminal activity but denied having actual knowledge of the money's criminal origins. But the District Court properly instructed the jury that it could rely on circumstantial evidence to find that Sherman had actual knowledge of the illicit purpose, *or* it could find knowledge from Sherman's willful blindness. *See Caraballo-Rodriguez*, 726 F.3d at 425, 431, 433–34

from the money drops were bound for Mexico. Sherman admitted making the money drops as a favor for his brother in Mexico, and Martin testified that the cash belonged to Sherman's partner drug-trafficker who resides in Mexico.

11

(permitting knowledge to be proven in a drug-conspiracy case based on actual knowledge or willful blindness). Willful blindness "is deemed to satisfy a scienter requirement of knowledge" where "the defendant himself [was] subjectively aware of the high probability of the fact in question[.]" *Id.* at 420 n.2 (quoting *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000)). Here, Sherman testified that he did not ask his brother where the money-drop cash came from because that would sound like a set-up, and he admitted thinking that the cash was "[m]ost likely" from criminal activity, App. 450. Based on that evidence, a reasonable jury could find that Sherman was willfully blind to the illicit purpose of transporting the cash.

**B**

The drug-conspiracy count of the indictment charged Sherman with conspiring with unnamed individuals to distribute and possess with intent to distribute at least 500 grams of cocaine from 2012 to May 2018 in the Eastern District of Pennsylvania, the Middle District of Pennsylvania, the Southern District of California, and elsewhere. The trial evidence easily supported the conviction. Sherman admitted selling cocaine in Lancaster (in the Eastern District of Pennsylvania) from 2012 to 2014 and possibly 2015. Alston testified that he bought up to two kilograms of cocaine from Sherman each week during that period and that Sherman got the cocaine from California. There was also considerable evidence that Sherman conspired with Beltran, his brother, or both to deliver drug proceeds from Harrisburg to Mexico in 2015 and 2016. During those deliveries, Sherman passed the drug proceeds to individuals in Harrisburg (in the Middle District of Pennsylvania), those individuals passed the money to others in Los Angeles (in the Southern District of

California), and then the money made its way to Mexico. Additionally, Sherman admittedly bought cocaine in Los Angeles County (in the Southern District of California) in April 2016 with the intent of reselling it, and he frequently drove his trap-equipped truck between Pennsylvania, Mexico, and California during the relevant years. This is ample evidence upon which a reasonable jury could infer that Sherman and others "could not have carried out their activities except as the result of a preconceived scheme or common understanding." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (cleaned up).

## III

Next, Sherman argues that the government's evidence of the drug conspiracy impermissibly varied from the charge in the indictment. Instead of proving one conspiracy, Sherman argues that the government presented only evidence of three unrelated conspiracies: one with Alston from 2013 to 2014, a second with Beltran from October 2015 to January 2016, and a third with individuals in California in April 2016.

"A defendant alleging a variance between a single conspiracy charged in an indictment and the proof presented at trial must demonstrate, first, that there was such a variance and, second, that the variance prejudiced one of his substantial rights." *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002) (quoting *United States v. Quintero*, 38 F.3d 1317, 1337 (3d Cir. 1994)). We need not address whether there was a variance because, even if the conduct alleged varied from the conduct proven, it did not prejudice Sherman's substantial rights.

13

The rule against variances has at least three purposes. *United States v. Kemp*, 500 F.3d 257, 291 (3d Cir. 2007). First, it protects a defendant's right "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Id.* (quoting *United States v. Schurr*, 775 F.2d 549, 553 (3d Cir. 1985)). In that way, it seeks to prevent a jury from "transfer[ring] guilt from one alleged co-schemer to another" or permitting evidence of other defendants' actions in a separate conspiracy to spill over into its consideration of the evidence against the defendant. *Id.* (cleaned up). Second, "the rule ensures that a defendant has adequate notice of the charges being brought against him." *Id.* (citing *Perez*, 280 F.3d at 345). Third, it "helps to minimize the danger that the defendant may be prosecuted a second time for the same offense," based on "a principle akin to double jeopardy." *Id.* (quoting *Schurr*, 775 F.2d at 554).

Sherman does not argue that he suffered prejudice related to any of these three purposes. Instead, he argues that the variance prejudiced his substantial rights by (1) permitting the government to introduce prejudicial evidence of extra-venue conduct that would otherwise have been inadmissible under Fed. R. Evid. 404(b), and (2) putting him at risk of being convicted by jurors who did not agree on the same conspiracy. Neither argument is availing.

**A**

Sherman's first prejudice argument relates to his pre-trial motion to dismiss the drug-conspiracy count for lack of venue. In that motion, he argued that the drug-conspiracy count involved conduct with no connection to the Middle District of Pennsylvania. But the government can generally prosecute a conspiracy offense "in any district in which such

14

offense was begun, continued, or completed," 18 U.S.C. § 3237(a), or "wherever a co-conspirator has committed an act in furtherance of the conspiracy," *United States v. Renteria*, 903 F.3d 326, 329 (3d Cir. 2018) (quoting *Perez*, 280 F.3d at 329). Because the indictment alleged that at least part of the conspiracy took place in the Middle District of Pennsylvania, the District Court denied the motion.

On appeal, Sherman does not challenge the District Court's venue ruling directly. Instead, he argues that the variance between the indictment and the trial evidence led to the admission of prejudicial, extra-venue propensity evidence—specifically, his 2016 drug arrest in Los Angeles County (in the Southern District of California) and his dealings with Alston in Lancaster (in the Eastern District of Pennsylvania). In his view, his dealings with Beltran constituted the only drug trafficking conspiracy properly before the Middle District of Pennsylvania jury. And he argues that evidence of extra-venue conduct was the only evidence supporting that the conspiracy with Beltran involved cocaine as opposed to some other controlled substance.

We disagree. First, the evidence he challenges was not evidence of *other* crimes. *See* Fed. R. Evid. 404(b) (governing the use of "[e]vidence of any other crime, wrong, or act"). It was evidence of the crime charged in the indictment: a cocaine-trafficking conspiracy that spanned six years and at least three judicial districts. If believed, it directly proved that Sherman acted with others to distribute or possess with intent to distribute cocaine. *Cf. United States v. Green*, 617 F.3d 233, 248 (3d Cir. 2010) (holding that evidence of an uncharged crime is intrinsic evidence of the charged offense—and need not be analyzed under Rule 404(b)—"if it directly proves the charged offense" (cleaned up)). Second, while Sherman is

15

correct that no evidence specified that the money drops he made between October 2015 and January 2016 involved cocaine proceeds, the jury was free to infer the identity of the drug from other evidence—including his cocaine sales to Alston in 2012 and 2013 and his purchase of two kilograms of cocaine in California in April 2016. Sherman points to no authority (and we know of none) that the government only can charge conspiracies that involve conduct in a single district. Here, the government charged a cross-district conspiracy and the District Court admitted evidence proving that conspiracy. The admission of that evidence did not prejudice Sherman's substantial rights.

**B**

Sherman also contends that evidence of three conspiracies prejudiced his right to a unanimous verdict. He argues that the government put him "at risk of being convicted where jurors based their finding of guilt on different potential conspiracies." Appellant's Br. at 57.[4]

We discern no prejudice to Sherman's right to a unanimous jury. The District Court instructed the jury of its duty to reach a unanimous verdict. It also correctly instructed

---

[4] Sherman argues that the prejudice to his right to a unanimous verdict was exacerbated by two aspects of trial: the government's closing argument about unanimity and the District Court's failure to give a specific unanimity instruction *sua sponte*. He did not object to the closing argument or the lack of a specific unanimity instruction during trial, and on appeal he makes no independent claims of error based on these aspects of trial.

the jury that it could not convict Sherman of the drug-trafficking conspiracy unless it found that he knowingly joined an agreement with at least one other person who shared the intent to distribute or possess with intent to distribute cocaine. *See United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010).[5] After deliberating, the jury convicted Sherman of conspiracy to distribute or possess with intent to distribute cocaine from on or about 2012 to May 2018. It also unanimously agreed that the object of the conspiracy was to distribute or possess with intent to distribute 500 grams or more of cocaine. Given the instructions, the verdict, and the evidence admitted at trial (which included Sherman's admitted cocaine sales, his admitted money drops amounting to over $400,000 in cash, and his arrest in possession of over two kilograms of cocaine), we are unpersuaded that the jury was not unanimous as to Sherman's guilt of the charged conspiracy.

## IV

Lastly, Sherman challenges the District Court's finding that he possessed a dangerous weapon in connection with a drug offense. Based on that finding, the Court imposed the dangerous-weapon sentencing enhancement. U.S.S.G.

---

[5] To the extent that Sherman contends that the jury needed to be unanimous about the identity of his co-conspirators, he is incorrect. *See United States v. Edmonds*, 80 F.3d 810, 823 (3d Cir. 1996) ("[T]he law of conspiracy . . . generally has not required the jury to unanimously agree on the identity of the defendant's co-conspirators."); *Boria*, 592 F.3d at 481 (stating the elements of conspiracy, which do not include the identity of the other conspirator(s)).

§ 2D1.1(b)(1) (providing for a two-level increase to a defendant's base offense level "[i]f a dangerous weapon (including a firearm) was possessed" in connection with certain offenses involving drugs). We review the factual finding for clear error. *United States v. Denmark*, 13 F.4th 315, 317–18 (3d Cir. 2021).

Relying on Sherman's testimony that he had access to handguns in his house when he stored drug proceeds there, the Court found a sufficient connection between Sherman's constructive possession of the guns and the drug trafficking conspiracy. The record supports this finding, so there is no clear error. *See Henderson v. United States*, 575 U.S. 622, 626 (2015) ("Constructive possession is established when a person, though lacking . . . physical custody, still has the power and intent to exercise control over the object.").

\* \* \*

For the reasons set forth above, we will affirm the District Court's judgment.